IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

SHAWN RILEY, Plaintiff,

−VS−

W. INDA WATERMAN
SANDRA MCARDLE,
WARDEN BOUGHTON,
DOCTOR MILLER,
V. LABELLE, LORI SALSUM,
W. BROWN, J. RAYNE,
P. JAEGER, A. BROADBENT,
SPECIAL NEEDS COMMITTEE
MEMBERS,
Defendants.

Case No. 20-C-1252

EASTERN DISTRICT COURT
FILED
'20 JUL 14 A 11:51
CLERK OF COURT

Civil Rights Complaint
pursuant to 42 U.S.C. § 1983, et seq.

Jury Demand

NOW COMES Shawn Riley, Plaintiff, pro se (hereinafter "Riley"), with this instant complaint pursuant to 42 U.S.C. § 1983, et seq., against the named Defendants with Federal claims as raised herein, & respectfully shows this Honorable Court as follows:

PARTIES

1. Shawn Riley, is the Plaintiff in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, a prisoner at the Wisconsin Secure Program Facility (WSPF), 1101 Morrizon Drive, Post Office Box 1000, Boscobel, WI 53805; & who is now a prisoner at Green Bay Correctional Institution, 2833 Riverside Drive, Post Office Box 19033, Green Bay, WI 54307−9033.

2. Wlinda Waterman (Waterman), is a defendant in this action, is a United States citizen & adult resident of

Wisconsin, who was at all times relevant to the events as described within this action, an employee of the Wisconsin Department of Corrections (WDOC), as a Health Service Manager (HSM) & also as a member of the Special Needs Committee (SNC) at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in her official & individual capacities.

3. Sandra McArdle (McArdle), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as a Nurse Practitioner (NP), at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in her official & individual capacities.

4. Warden Boughton (Boughton), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as the Warden at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in his official & individual capacities.

5. Doctor Miller (Miller), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC,

as the Doctor at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in his official & individual capacities.

10. J. Labelle (Labelle), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as a Nursing Coordinator at the Department of Adult Institutions Offices (DAI), Post Office Box 7925, Madison, WI 53707-7925. This instant defendant is sued in her official & individual capacities.

7. Lori Alsum (Alsum), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as a Nursing Coordinator at the DAI offices, Post Office Box 7925, Madison, WI 53707-7925. This defendant is sued in her official & individual capacities.

8. W. Brown (Brown), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as an inmate complaint examiner at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in his official & individual capacities.

9. J. Payne (Payne), is a defendant in this action, is

a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as an inmate complaint examiner at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in his/her official & individual capacities.

10. P. Jaeger (Jaeger), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as the/a Warden at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in his/her official & individual capacities.

11. A. Broadbent (Broadbent), is a defendant in this action, is a United States citizen & adult resident of the state of Wisconsin, who was at all times relevant to the events as described within this action, an employee of the WDOC, as a Unit Manager (UM) & also as a Prison Rape Elimination Act (PREA) investigator at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. This instant defendant is sued in his official & individual capacities.

12. All SNC members are defendants in this action, are United States citizens & adult residents of the state of Wisconsin, who were at all times relevant to the events as described within this action, employees of the WDOC, as SNC members at WSPF, 1101 Morrison Drive, Post Office Box 1000, Boscobel, WI 53805. These instant defendants are sued in their official & individual capacities.

## STATEMENT OF RELEVANT FACTS

13. On May 15, 2016, Plaintiff Riley submitted a Health Service Request (HSR) to the Health Service Unit (HSU), seeking treatment for severe pain in his feet, ankles, knees & leg muscles. Riley informed HSU that he knew some of the pain was being caused by Riley's preexisting life-long leg deformity of being Duck-footed, viz., having an aversion of the feet, causing malalignment of Riley's leg joints (ankles, knees & hips). Riley further explained to HSU that the once-familiar pains from his being Duck-footed had rapidly become worse & was now compounded by other conditions & complications that had arose during Riley's then recently concluded 4½ (four & one half) (straight), Disciplinary Segregation (Seg) / Administrative Confinement (AC) stint where Riley had been isolated & not only unable to exercise as he would have been able to in General Population (GP) but Riley was also deterred from exercising as far as he was capable of on said status due to the ill-adverse effects of Riley's prolonged punitive status. Riley elaborated to HSU that the newly compounding conditions & complications were also related to Riley's continuous engagement in sports for the past 25 (twenty-five) years of his then 35 (thirty-five) year old life, on concrete surfaces. Riley's position was based on the fact that once common standing, walking & running on hard surfaces, now caused Riley severe, debilitating pain. In addition, in being imprisoned, Riley is compelled to occupy, mobilize & engage on concrete & steel surfaces.

14. On July 26, 2016, Riley was seen & evaluated by

NP Cynthia D. Griffin (Griffin) via televed regarding Riley's May 15th request concerning pain. Riley explained to Griffin that the pains from his life long deformity of being Duck-footed had become chronic & were now compounded by frequent sensations of cramping spasms in his feet & calves; which caused Riley to awake from sleep, & prevented Riley from being able to mobilize or fully extend his legs, or return back to sleep. Riley informed Griffin that the chronic pain & spasms were severely painful & disruptive to his once (daily) routine activities, & that the spasms usually lasted 20-25 minutes. Griffin prescribed pain medication in the form of Ibuprofen at 800 mg, 3-times per day for 14 days; Physical Therapy (PT) with USA's Physician; a bilateral compression brace for both knees & instructions for a "home exercise" PT regimen for Riley to perform daily.

15. From August 4, 2016 to December 15, 2016, Riley was forced to submit several requests to HSU, grieving about his conditions becoming worse, & continuously pleading for care in placing HSU on NOTICE that he had not received the PT that had been ordered/prescribed by Griffin. During said time, Riley also provided to HSU that his conditions & complications were preventing him from being able to do once routine things such as standing, walking or running in certain manners, especially for long periods of time. Other activities that were prevented as well were the performance of Riley's 5 (five) obligatory daily prayers as a Muslim. In addition,

Riley placed HSU on NOTICE that the medication, home exercises & knee braces were ineffective towards addressing/mitigating or correcting Riley's serious medical needs. Over the course of grieving, complaining & placing HSU on NOTICE, Riley was provided a temporary restriction for an extra pillow for what HSU knew to be for long-term serious medical needs; this shows HSU's disregard for the 'standard of care'. The pillow restriction had no bearing at all towards helping/treating Riley's serious medical needs.

16. Where Riley's conditions & complications worsened with Riley being denied adequate & effective care. Naturally, Riley continuously submitted requests to HSU, grieving & requesting adequate/effective care before HSU finally referred Riley to an offsite (independent from WSPF) (HSU) Specialist due to their inability to determine what Riley's conditions & complications were. & for Riley to receive the necessary care that would address & correct Riley's serious medical needs.

17. On March 24, 2017, Riley was finally seen & evaluated by foot Specialist, P. Michael Jacobs (Jacobs), DPM, at Gunderson Boscobel Area Hospital & Clinics (Gunderson) for said conditions/complications that Riley continuously suffered from daily, in either being denied adequate care or from having received ineffective care for up to an entire year at this point.

18. During Riley's visit with Jacobs, Jacobs confirmed/

diagnosed Riley's pre-existing life-long leg deformity of being Duck-footed. Jacobs also determined/diagnosed Riley with having collapsed medial arches in both feet, viz., having flat feet. Jacobs further determined/diagnosed that Riley had been suffering from Plantar Fasciitis.

19. 19. Jacobs explained to Riley that Riley's aversion of the feet (Duck-footed), compelled Riley's feet outward, causing malalignment of Riley's hips, knees & feet, causing pain in Riley's lower extremities, & could effect one's back in the instance of the condition being left untreated or treated improperly. Jacobs further explained to Riley that Riley's flat feet prevented the necessary arch support & flexibility that was needed for normal/proper stability in one's feet, & that this distorted Riley's entire skeletal structure. Jacobs also explained to Riley that Plantar Fasciitis effected/distorted the pallet of Riley's feet & caused painful spasms that would become debilitating in being left untreated or treated improperly/ineffectively.

20. 20. Jacobs ordered/prescribed for Riley to occupy soft shoe inserts in combination with Athletic style tennis shoes that were 'High Top' in nature where the soft inserts would combat the ill-adverse effects of Riley's Plantar Fasciitis & painful repetitive joint compression of Riley's malaligned joints; the Athletic style footwear would combat/accommodate Riley's flat feet & skeletal structure while the High Top nature of the footwear would provide ankle support of Riley's malaligned joints. This would be a temporary approach made by Jacobs before any other action would be taken at a scheduled follow up.

21. Upon returning back to WSPF, Riley would occupy the soft inserts but they were completely ineffective in being occupied in general footwear; because unlike the inserts, which were dispensed at/by Jacobs office (which was a medical apparatus being occupied by Riley from an outside vendor), free of charge, Riley was to purchase his own medical apparatus in the form of Athletic style tennis shoes that were 'High Top' in nature but would not be able to do so as such footwear was unavailable through the "approved vendors" that inmates were restricted to consuming from within the WDOC, unless one had a medical ORDER/ restriction to consume elsewhere.

22. Where Riley was unable to access/occupy the Athletic style 'High Top' tennis shoes, Riley remained without adequate/effective care, & Riley continuously grieved to HSU about his conditions worsening in requesting a medical restriction that would allow Riley to access/occupy said medical apparatus from an outside vendor as the approved vendors were for general consumption while Riley's medical needs were specific to him. However, HSU defiantly refused to mediate Riley accessing/occupying his ORDERED/prescribed care that HSU themselves designated Riley off-site to receive, HSU's habitual disregard for the 'standard of care' left Riley suffering in chronic/severe pain on a daily basis before Riley would next see Jacobs for a follow up.

23. An "approved vendor" is a vendor that the WDOC

was limited its inmates consumption to, supposedly, to minimize the risk of contraband coming into its prisons from unfamiliar sources while contraband continues to be brought into its prisons by its most familiar source — its officers. Thus, undermining the validity & need for said policy, as it has in fact, not reduced or prevented the presence of contraband in the DOC prisons.

24. Riley's continuous effort to access/occupy his ORDERED/prescribed medical apparatus was met with defendants Waterman & McArdle dismissing Riley's serious medical needs by fabricating to Riley that he could only occupy footwear from the approved vendors while both knew that general footwear could not effectively accommodate the peculiar conditions of Riley's legs & feet. However, desperate, Riley moved to occupy the "highest" style tennis shoe available at the approved vendors but in receiving them, they were not "High Top" & they especially were not "Athletic" in lacking the necessary arch support that was needed to accommodate Riley's leg deformity, flat feet & Plantar Fasciitis adverse effects.

25. On April 1, 2017, shortly after Riley's visit with Jacobs, Riley encountered inmate Eduardo Head (Head) on the housing unit that both inmates were housed on. Head had recognized Riley's last name on Riley's identification tag (which is commonly worn & displayed openly on one's chest for easy access), where Head inquired to Riley if his name was Shawn Riley, & if he had recently gone to an off-site visit with a foot specialist.

After Riley identified himself to Head Head informed Riley that while he was occupying a medical bike (that was situated down a side corridor from the officer station) in HSU when he was within hearshot of Waterman telling a non-medical staff member (a Corrections Officer (C.O.) who frequented the Security post/desk at HSU) that Riley had recently gone to an off-site visit with a foot Specialist who had ORDERED/prescribed for Riley to occupy a personal medical apparatus in the form of Athletic style High Top tennis shoes but that, if Riley thought he was going to have personal shoes, he had another thing coming; viz., that Waterman would do all it was within her power/authority, & what was against policy also, to see that Riley would not access/occupy his ORDERED/prescribed footwear that HSU themselves designated Riley offsite to receive, & with Waterman being the HSM, preventing Riley's care would not be difficult at all as Waterman not only oversaw all general service at HSU but Waterman also oversaw all orders/approvals for "special medical restrictions" being presented to the SNC for review, in being the highest ranking medical member on the Committee & Head volunteered to provide Riley with a declaration regarding Waterman's deliberate violation of Health Insurance Portability & Accountability Act (HIPAA) statutes, which would become actual deliberate indifference, just as Waterman promised.

216. Subsequently, Waterman demonstrated exactly what Head had alleged in his declaration as Waterman's promise began to take shape where she continuously

disregarded Riley's serious medical needs by fabricating that Riley could only access/occupy his prescribed medical footwear from the restricted/approved vendors that served for general consumption, everytime Riley requested to have his ORDER for care to be before the SNC for review; while Waterman was aware that Riley could not access his medical footwear from the general vendors. Further, if Riley was able to, Waterman would have never objected to or refused Jacobs' ORDERED care, nor would she have vented to non-medical staff in verbalizing her intent to be deliberately indifferent towards Riley's serious medical needs. & just as Waterman's promise began to take shape, she would persist in demonstrating her intention to see that Riley had another thing coming if he thought he was going to get personal footwear; all while Waterman was aware that Riley was suffering in pain in remaining without adequate care.

27. On April 14, 2017, Riley executed an inmate complaint against Waterman's misconduct, alleging deliberate indifference & violations of HIPPA statutes. This complaint was dismissed with modification as the Reviewing Authority could not determine credibility between inmate witness Head & HSM Waterman while there was but one way for Head to have known what he had declared, & that was through Head actually having overheard what he had declared in his declaration. However, the Reviewing Authority (RA) did admonish Waterman in asserting, "all HSU staff should exercise great caution about discussing any health related matters in the

presence of non-health staff & other inmates.

28. While anticipating a follow up with Specialist Jacobs, Riley continued to suffer from chronic/severe pain as Riley's conditions worsened in being left untreated. Riley submitted requests regularly to HSU, grieving & requesting access to his prescribed care, only to have defendant McArdle (who had designated Riley off-site due to HSU's (her own) inability to diagnose or treat Riley), persist in care that was not only delayed but it was completely ineffective as well. McArdle persisted in such disregard & recklessness over the Expert's/Specialist's ORDERS while McArdle knew firsthand that she could not address/correct Riley's serious medical needs with any action that she took other than mediating Riley accessing the specific care that Jacobs had ORDERED for Riley to receive.

29. McArdle's deliberate indifference was made clear for the record when McArdle persisted in ineffective measures to order X-rays on Riley's lower extremities while there were no concerns for fractures, & Jacobs had established for the record, Riley's serious medical conditions & needs. However, not only did McArdle persist in ineffective care subsequent to Jacobs' expertise but McArdle fabricated the results of the X-rays as being normal while X-rays on Riley's back revealed Riley's distorted & extremely poor posture which was the direct result of Riley's conditions having become worse in being left untreated. Riley grieved to HSU about the

exacebation of his conditions/complications, placing HSU on NOTICE that his pains had become chronic/severe & that he had begun to experience needle-poking & burning sensations in his legs & feet. McArdle would evaluate Riley & diagnose Riley with having chronic/severe pain in his lower extremities but would still fail to take any rational or effective action towards treating Riley for serious medical needs that she was aware Riley had. mediating Riley accessing/occupying his prescribed medical apparatus was never entertained.

30. On May 5, 2017, Riley was finally seen for a follow up with Jacobs at Gunderson where Riley immediately grieved to Jacobs about his conditions becoming worse as they had begun to effect Riley's back & Riley had also begun to experience needle-poking & burning sensations in his legs & feet. Jacobs would inquire, "how did the inserts work with the Athletic High-Tops?" Riley explained HOF's/HSU's defiant refusal to allow Riley access to the medical footwear, & Jacobs would then inquire, "have you worn the inserts in the shoes that you have?" After Riley answered, "yes". Jacobs inquired, "how did that work?" Riley informed Jacobs that the soft inserts appeared to work in general footwear but the inserts broke down in right right away & were as useless as wearing them on the concrete pavement. Jacobs informed Riley, "you're exactly right, you must use the inserts in combination with the appropriate footwear for maximum support, given

your individual medical needs." Further, Jacobs baff-led, stated to Riley, "I don't understand why WSPF would refuse the care that they sent you to me to receive?!" Riley had no explanation, either.

31. Jacobs evaluated Riley & documented Riley's exacerbated complications of having a tight heel cord, collapse of medial arches in both feet & unaligned joints in both legs, before molding Riley's feet for prescribing Riley custom orthotics to accommodate the peculiar shape of Riley's feet. Jacobs again prescribed for Riley to occupy Athletic style tennis shoes that were High Top in nature, & elaborated, "will help control mid foot to ankle motion & help promote a more neutral gait with less symptoms." Jacobs also ordered a PT assessment with WSPF's Physician for Riley's lower back pains.

32. Upon returning back to WSPF, McArdle would provide Riley with an instruction manual for occupying his custom orthotics; these instructions were provided to McArdle by Jacobs. The instructions informed/placed McArdle/HSU on NOTICE that, "without orthotics, your arches collapse & cause pain & fatigue (thus, where Riley's arches had already collapsed in both feet, it shows the pain that Riley had been grappling with, & further, the pain that Riley would suffer if Riley was unable to occupy his custom orthotics). Orthotics brace your feet as you walk or run"; "A shoe that is the wrong shape works against the orthotic, you will make your

foot problems worse, not better"; "Wear your orthotics for 3 weeks, if they still cause discomfort or feel high in certain places, they may need correction, schedule an office visit with your foot Doctor to have them adjusted."

33. The Defendants were adamant in their intentions & tactics to assure that Riley "had another thing coming, if he thought he was going to access/occupy prescribed personal (medical) footwear." The Defendants exercised their intentions & tactics effectively; leaving Riley without his prescribed footwear while knowing that Riley was not only in pain but that Riley's pain complications would become worse in the instance of Riley being refused/denied access to his prescribed footwear. In addition, the Defendants would began to take on the tactic of shopping around for a(n) (indifferent) second opinion, even with Specialist Jacobs himself.

34. Once again, Riley executed an inmate complaint against the deliberate indifference of being denied his prescribed medical footwear that had accommodated Riley before & during his imprisonment.

    NOTE: Riley occupied leg braces to accommodate
    his aversion of the feet as an adolescent.
    subsequently, Riley occupied Athletic style —
    High Top tennis shoes that were usually
    Air Sole as well. Such footwear combatted
    repetive joint compression, were shock absorption

& provided arch & ankle support. The style (high-top, mid-top or low-top) of such footwear depended on the activities that Riley was engaged in; however, 9 out of 10 times, the footwear was equipped with Air Sole. Upon being imprisoned, such footwear remained available to Riley as general consumption until the WIDOC restricted its inmates consumption to "approved vendors"; viz., Riley occupied this style of footwear from 1999 to 2007. At which time Riley was able to continue to occupy such footwear beyond the inception of the approved vendor policy where such footwear was defined as "Grandfathered" property. Riley continued to occupy such footwear until, inevitably, they became too worn to provide adequate support. However, had Riley elected to continue to possess such footwear, Riley would have been able to do so up to present date, even without any medical restriction, which reflects the DOC's exaggerated policy.

Riley's grieving/grievance was simply & defiantly dismissed by defendant LaBelle citing, "A recommendation from an off-site Provider is not an ORDER that the DOC is obligated to follow"; which was disturbingly ridiculous in the instance that WDFF/the DOC themselves had designated Riley off-site to receive care due to their own inabilities, regardless of what that care may consist

of. Further, the WDOC would designate Riley off-site for "care" six more times beyond LaBelle's deliberately indifferent assertion, where seperate from two off-site visits related to neurology testing, all other off-site visits resulted in having Jacobs' orders for care upheld/ordered for Riley to receive as optimal care.

35. On May 23, 2017, as ordered by Jacobs, Riley was evaluated by WSF's physician, Krueger, concerning back pains. Riley grieved to Krueger & expressed his fears & concerns that Physical Therapy would be ineffective on his back as Krueger had unsuccessfully treated Riley with multiple stints of Physical Therapy for medical needs that worsened subsequent to the PT. Riley also informed Krueger that his back pains worsened or was was especially problematic when Riley was engaged in common activities such as sitting, standing & walking, & that he was reduced to being unable to carrying out once routine daily activities, most notably the performance of Riley's 5 obligatory daily prayers as a Muslim. Krueger diagnosed Riley with postural deficits, decreased strength, range of motion & muscle flexibility, & having pain before prescribing Riley a Transcutaneous Electrical Nerve Stimulation (TENS) unit to combat Riley's pains. However, just as Jacobs had ORDERED the medical footwear for Riley to receive, the Defendants cherry-picked which care that they would mediate &/or follow/allow for Riley to receive; & of course, in

hollow formality, the Defendants eagerly & defiantly persisted in reducing & compelling Riley to "occupy care that was ineffective & had no bearing at all towards mitigating or correcting Riley's serious medical needs, which was the case with the TENS unit.

36. During the time in between Riley's second & third visit with Jacobs (1st visit subsequent to LaBelle's assertion), defendants Waterman, McArdle & LaBelle, in a "top down approach", defiantly disregarded Riley's serious in assuring Riley that he had another thing coming (if he thought he was going to occupy his prescribed medical footwear), where countless health service requests & inmate complaints were mishandled & denied/ignored in hollow formality for no legitimate reason.

37. Just as the custom orthotics instructions manual warned, Riley suffered severe pain in occupying the custom orthotics in general footwear (the wrong shoes); this made matters worse.

38. On May 25, 2017, Riley submitted a request to McArdle, grieving that the custom orthotics that were supposed to accommodate the peculiar shape/condition of Riley's feet, did not mitigate or correct Riley's conditions, & they in fact, made Riley's conditions worse just as the manual warned. Though Riley suspected wearing the custom orthotics in the wrong shoe would make matters worse,

Riley was compelled to occupy the orthotics in this manner because, just as Riley had grieved to HSU against care having been ineffective in the past or likely being ineffective in the future, HSU would eagerly undermine Riley's grieving/suffering by questioning "Are you refusing treatment?" Such was the case when Riley grieved to McArdle that he must as well wore the custom orthotics on the concrete pavement. Further, Riley grieved to McArdle that his pains had become so severe & stagnate (with regards to being corrected; however, they changed for the worse), that they were mentally & emotionally taxing. Riley requested to have Cortisone shots to combat pains in his feet, legs, right hip & back but HSU never entertained this as a possible form of care towards treating Riley.

39. On June 5, 2017, Riley submitted a Health service request to McArdle again, grieving that his custom orthotics were as useless as the trial outs. Riley further grieved that the chronic/severe pains in his feet, legs, right hip & back had persisted & was preventing Riley's once routine daily activities. Riley requested for McArdle to mediate him being able to access/occupy his prescribed medical apparatus at his own expense. McArdle instructed Riley to give the orthotics one month to determine their effectiveness. Riley would be seen by McArdle regarding this request where Riley grieved to

Original complaint, page 20

McArdle that in giving the orthotics one month, he must occupy them in combination with the specific medical footwear that Jacobs prescribed & instructed for Riley to occupy them in, & not in the wrong shoe as the orthotics manual warned against. McArdle would then make it clear that she/HSU would shop around for a difference of opinion when she responded to Riley, "You're not getting any fancy shoes. I'm going to request another Podiatry visit to determine if that's necessary." McArdle's defiant & reckless disregard to refuse/circumvent Jacobs' ordered care instead of allowing Riley to exhaust said care before referral back to an off-site Specialist, shows that McArdle's intentions were just as clear as Waterman's were to assure that Riley had another thing coming if he thought he was going to get his prescribed footwear.

40. Subsequently, as Riley suffered in idle anticipation of another offsite visit with a Specialist, Riley submitted many more requests to McArdle from June 19, 2017 to August 9, 2017, requesting to access & occupy his ordered care in grieving about his worsening conditions. & placing McArdle/HSU on NOTICE that the custom orthotics were not only useless in being forced into the wrong shoes but that they were causing Riley pain in being worn in this manner. Riley also grieved that he had not received his prescribed TENS unit. McArdle knowing that no care provided by her/HSU could replace Jacobs' ordered care as being more/most effective, ordered for

Original complaint - Page 21
Case 2:20-cv-01252-PP Filed 08/14/20 Page 21 of 87 Document 1

Riley to see WCPF's Dr. Miller in order to have his unaligned, joints reset in relation to Riley's problematic complications with having an aversion of the feet. instead of mediating Riley occupying the most effective care at Riley's own expense.

41.    Untreated, on August 1, 2017, Riley submitted a request to McArdle, grieving about his conditions becoming worse. After having been reduced to suffering through the stagnant, tactical & repetitive run. around routine of Riley receiving the other thing that he had coming (in place of the ordered care that he thought he would receive); Riley questioned HSU's desire & ability to provide Riley with adequate/effective care in grieving against the denial of care; most recently, Riley's TENS unit that he had yet to receive, & the then two month delay of Riley seeing an offsite Specialist. McArdle responded to this request, acknowledging, "the Podiatrist or the Orthotics lab, or both are the people who can best address this issue.

42.    On August 10, 2017, Riley executed a complaint, grieving against the denial of care in never having received his TENS unit. This complaint detailed McArdle's deliberately indifferent actions of continuously fabricating that she had checked into Riley receiving his unnecessarily delayed TENS unit, only to never do so before Riley was able to confront McArdle in the presence of Krueger (who ordered the TENS unit), during a chance encounter where McArdle fabricated further that she

had spoken to Krueger about the matter. Riley would be denied his prescribed TENS unit for 3 months. Even while Riley continuously grieved to HSU about the denial of his TENS unit, Watennan admitted that this ordered care was unnecessarily delayed & overlooked. Riley's complaint was affirmed, & it shows that Riley's grievance/ complaint against the denial of his prescribed footwear should have been affirmed also but Lori Alsum & LaBelle defiantly turned a blind-eye to this rationale.

43. Riley also executed a complaint against the 1½ month delayal of Riley seeing a foot specialist. This complaint detailed Riley being unable to occupy his prescribed orthotics & footwear, his conditions worsening, & Riley expressing his anxiety that the 1½ month delay would turn into a 3½ – 4 month delay/denial while HSU had been instructed to have Riley seen by a foot specialist if Riley experienced pain or discomfort in occupying the orthotics after 3 weeks. Just as Riley feared, he would continue to suffer in chronic/severe pain in idle wait for 10 months. However, even while this denial of care was just as clear as the denial of Riley's TENS unit, Alsum intentionally overlooked this matter & dismissed Riley's complaint.

44. On August 15, 2017, Riley was evaluated by WSP's very own Chief medical provider, Dr. Miller, & in spite of Waterman & McArdle's efforts to assure that Riley had another thing coming, Miller diagnosed Riley with having an aversion of the feet, causing malalignment in Riley's leg joints; & Plantar Fasciitis before

prescribing Riley occupy lower leg splints or boots, Athletic
tape, Air, Gel, Tennis shoes, socks & sandals
from an outside vendor, beyond the #75 general property
purchasing limitations. Miller also informed Riley that
he had been taking a useless medication for pain,
& that it was more harmful than helpful for Riley,
given that Riley had been taking pain medication
(Naproxen or Acetaminophen) for then, the previous 6
years (& unbelievably, up to present date) to combat Riley's
said medical needs, & for a then lingering hand
injury. The medication had no bearing at all towards
correcting Riley's serious medical needs but
rather the useless medication served as a detrimental
suppressor that diverted Riley's awareness of his pains.
However, the useless, detrimental medication remains the one
thing that HSU has eagerly made readily available for
Riley to receive.

45. However, Riley's visit with Miller was not as fluid
& orderly as it may appear to have been, as
Miller in fact sexually assaulted Riley during what
was supposed to have been an
examination of Riley's lower extremities, where Riley would
not have his pants reset as he had been scheduled
to.

46. Upon entering Miller's office, Miller immediately took
notice to Riley's physique & commented, "My God, do
you work out? You got muscles everywhere."
In thinking Dr. Miller's comment was unusual
& out of place, Riley turned up his face before

responding, "I ain't (have not) been able to work out because of pain." Miller then instructed Riley to step on the scale in order to be weighed. After being weighed, Miller told Riley that he could remove his glasses if he liked, & then requested for Riley to lie face down on the examination table so Miller could then adjust the table before joking with Riley, because you're a tall guy. Already uneasy about Miller's comment on his physique, Riley respectfully declined to remove his glasses, which were prescription, & Riley also requested for Miller to adjust the examination table before Riley lied on it, which Miller had no problem with.

47. Dr Miller's sexual assault on Riley was deliberate & intentional. As Riley lie face down on the examination table, Miller held both of his hands together on Riley's lower righthand back as Miller explained to Riley that he would apply pressure on Riley's lower righthand back by moving both hands & applying pressure in small circular motions, & for Riley to inform Miller if he experienced any pain from the pressure. Miller examined Riley's lower righthand back as described above, which took about 10-15 seconds. However, when Miller went to examine Riley's lower left back, Miller placed only his left hand on Riley's lower left back while Miller's right hand was on Riley's left buttock, squeezing & pressing down in an aggressive manner, forcing Riley's genitalia against the examination table as Miller simultaneously began to explain to Riley how he would examine his back, which Riley seen as

a diversion tactic to delay or prevent Riley from speaking
out & objecting to Miller's non-consensual groping
against Riley; & to also divert Riley attention
&/or reaction while Miller gratified himself in sexually
assaulting Riley for as long as possible. However, Riley
objected to Miller's disturbing, predatory sexual
misconduct in responding, "Get your hand off of my ass,
motherfucker! What's wrong with you, man?!" As
Miller responded immediately, "I'm sorry, I'm sorry, I'm sorry
... " in a quiet, calming attempt to deescalate Riley,
& to prevent a disruption where the officer stationed
directly across from the examination room would take notice
& get involved; Riley continued, "Don't ever touch my ass!
Don't do that shit again!" as Riley simultaneously
turned over & sat upright on the examination table.

48. A short time later, after by passing examining Riley's
lower extremities for other than the intended purpose,
Miller moved to examine Riley's feet, where Riley was now sitting
upright & at the end of the examination table. Miller,
now seated in a chair at Riley's feet, requested for Riley to
remove his shoes so that he could examine Riley's
feet.

49. Upon having his feet examined, Riley noticed that whenever
Miller questioned Riley, Miller would fixate his gaze directly
at Riley's genital area as Miller was situated in close
proximity to Riley, positioned in between Riley's legs with either
foot in his hand, hinge watching Riley's crotch at
approximately eye level (Miller's sight) as Riley responded to
Miller's questioning about the presence of pain

during the examination. However, angered & especially uncomfortable, Riley placed/rested his hands over his crotch area before stating to Miller (who was still clutching one of Riley's feet after having evaluated them (as he spoke), which), of course, Riley seen this as being unnecessary & invasive on said basis, correlated to the progression of Miller's sexual misconduct), "Hey, man, will you let my foot go (viz., release my foot)?!" Because I'm uncomfortable with that bullshit you just did." Miller then responded, "I'm sorry, I didn't mean to disrespect you." Riley then spat, "You sexually assaulted me, man, what the fuck is wrong with you?!" Miller then sprung up from his chair & moved to close the door as he asked Riley, "Do you mind if I close the door, the traffic's loud out there.", closing the door before Riley could even respond. Miller then rushed back towards Riley & responded further, "I didn't mean to disrespect you, we're running short on time, what is it that you need, & I'll write it down for you to receive." Miller began to document Riley's request for care before growing impatient with the length of the request, & telling Riley, "here, will you write it down & I'll redo it later?" as he handed Riley a piece of paper labeled "Progress Notes" that Miller had begun to write out a prescription on.

50.     On August 15, 2017, Riley filed a complaint against Miller's sexual assault. This compliant was discussed with the modification that an investigation be conducted outside of the Inmate Complaint Review System (ICRS) by a designated investigator at WSPF, in order to determine whether or not any violations of the WDOC's Executive Directive 110A/No TOLERANCE POLICY had occurred. However, Riley also utilized the Prison Rape Elimination Act (PREA)

hotline, seeking to have an independent & impartial arbitrator conduct a thorough/complete investigation into Miller's unlawful sexual misconduct; yet the investigation was (was) handled by defendant Broadbent, who was designated as the investigator in the matter. In addition, Riley wrote to defendant Boughton, requesting for surveillance evidence to be reviewed &, preserved for the coming investigation. Boughton informed Riley that the video footage was received & reviewed but the investigator would determine evidence for the investigation". Upon being interviewed by Broadbent, Riley provided a detailed account of Miller's sexual assault & requested that the video footage be reviewed & considered over his own, or Miller's account of the matter. However, Broadbent fabricated that reviewing any surveillance evidence was up to Central Office. Broadbent's (was) handling of the matter only served to protect Miller (as a counterpart to Broadbent); thus, the integrity of WDPF. Resolution of the matter was unfair & was improper as Broadbent systematically protected Miller & the integrity of his employer, & silenced Riley's grievance & complaining against Miller's predatory malpractice tactics through hollow formality.

51.   Aware that Broadbent was lying about accessing & utilizing the factual video footage, Riley feared that there would be no thorough, nor impartial investigation into Miller's sexual assault. Just as Riley feared; two months later Riley was served a delayed & unexpected memo, informing him that his claim against Miller was unfounded. Baffled, Riley wrote to Broadbent, questioning whether or not Broadbent reviewed & considered the factual video footage. Broadbent refused to answer & further deflected the

matter to the Security Director, who in return, pointed the finger back to Bradbent, just as defendant Boughton had done in informing Riley that Bradbent, as the investigator, would determine evidence for the investigation.

52. Silenced & pushed aside, Riley filed a complaint challenging Bradbent's perfunctory & hollow action taken to protect Miller; however, Riley's complaint was swept under the rug as an unaddressed internal matter as the Complaint Examiner asserted that PREA investigations were not within the scope of the authority of the ICRS. Riley then appealed to Boughton to no avail.

53. On August 13, 2017, Riley submitted another request to McArdle as Riley had been in continuous communication & contact with McArdle concerning Riley's worsening conditions in anticipation of Riley's scheduled follow up with a Specialist. In this specific request, Riley grieved about being tortured by disturbing pain that was debilitating & preventing Riley from doing once routine daily activities. Riley further grieved about the prolonged delay/denial of his follow up with a Specialist as he suffered in idle wait, which was for a total of two months at this point. This specific request had been signed off on by RN Edger & referred to McArdle on 14 August, 2017 & should have then been receipted to Riley; however, Waterman instead intercepted the request & taunted Riley, "Your Podiatrist (visit) is scheduled, not soon".

54. Waterman also challenged Riley's grieving & requests for timely & adequate care when she disputed Miller's orders for care in modifying &/or changing Riley's medical chart. Riley's medical chart shows that Miller made orders

to Riley to occupy lower leg night boots or splints & Air Bubbled (Air state) Athletic ankle-tennis shoes before he made a third note that, "Pt. (patient) needs catalog to place order". Waterman then undermined & clouged the Riley's medical record by noting, "not approved; HSU does not issue tennis shoes" Next to Miller's orders for Riley to occupy Air Bubbled Athletic tennis shoes, & "available on Units" next to Miller's note that Pt. needs catalog to place order"

55. On August 31, 2017, Riley filed a complaint against Waterman's deliberate indifference in intercepting the medical request that was intended for McArdle, regarding Riley's delayed/untimely visit with the Specialist. As usual, there was no serious consideration for Riley's grievance as the Examiner met with & relied on the perpetrator's position in "resolving" the matter, where Waterman was allowed to get away with citing Division of Adult Institutions (DAI) Policy 500.30. 11 out of context as it entails, "Daily handling of Non-Emergency Requests (for health care too):". There is no need for Riley to elaborate as it is clear that Riley's request was an emergency. Further, Waterman was allowed to rest her misconduct on the assertion that: "If it is an issue the nurse or HSM can address, they will do so", while Waterman could do nothing but mediate Riley occupy his ordered care but of course she was too busy taunting Riley in assuming that he had another thing coming. In addition, PH Edgar had already handled the request & referred it to McArdle where Waterman's actions here, were entirely unnecessary which shows her intentions, & integrity, given Waterman's field of

work. This complaint was recommended to be dismissed by the Examiner; & LaBelle, once again failed to take any action as the RA, to address & correct Waterman's deliberately indifferent misconduct as LaBelle accepted the Examiner's recommendation to protect Waterman. Riley appealed LaBelle inability to property govern tribunal here but to no avail.

56. On August 25, 2017, Riley again attempted to receive his visit with the Specialist when he submitted another request to McArdle, just as McArdle & Jacobs had instructed Riley to do in relation to receiving care. In this request Riley grieved about specific complications & his conditions becoming worse, in hopes that McArdle would mediate Riley's Specialist visit sooner, as she was the person who had scheduled the follow up. However, even after Riley's complaint against Waterman intercepting his request, Waterman intercepted this request as well, where before other medical personnel could refer the request to McArdle, Waterman intercepted it & referred the request to herself. Waterman, once again, taunted Riley in relation to Riley's grievance against his untimely Specialist visit where Waterman responded to Riley's request, "your follow up with Podiatry is a long-time away" before she spat, "HSU has nothing to do with your religious preference, nor is it a reason to do anything differently than what providers here (at WDF) ordered (even while Miller as their very own sole provider made orders for Riley to occupy Air Sole Athletic tennis shoes)", in responding to Riley's grieving about being in debilitating pain that prevented him from fulfilling his five obligatory daily prayers as a Muslim. In Waterman's wreckless "disregard", she still acknowledged, "Plantar Fascitis is a chronic condition that is not easily treated" before

asserting that FISU does not purchase tennis shoes while Filey never made such request, this was nothing more than an intentional diversion to dispute Filey's ordered care. Waterman even disputed that Filey had no order to return to the Specialist one month after his 05 May 2017 visit while Filey never made such claim but rather, Filey was instructed by Jacobs himself & subsequently McArdle, to submit a request to FISU in order to be seen by the Specialist if he experienced complications in occupying his custom orthotics after one month, which shows that Waterman was preoccupied with her intentions to see that Filey had another thing coming as she was uninformed to the specific handling of Filey occupying his prescribed orthotics, & that McArdle was more better suited & informed to have addressed Filey's request that was intended for her to receive.

57. On September 20, 2017, Filey executed a complaint against Waterman's deliberately indifferent malpractice of changing Miller's orders for Filey to occupy Athletic Air Sole tennis shoes, sandals (which Filey usually occupies for the majority of his day at leisure) & socks from an outside vendor, beyond general property guidelines. As usual, the Examiner met with perpetrator Waterman in reviewing Filey's complaint where Waterman made the ridiculous claim that Miller was a new Provider & was unaware (in spite of training) that FISU did not issue shoes (special ones) while she was unaware that Miller in fact had committed malpractice in allowing Filey to establish a medical record in hopes of preventing Filey's grieving & complaining against Miller's sexual assault; before Waterman would check the medical record, consult with Miller where Miller would then cherry pick through what Filey established for the record & then reestablish

it. Waterman would admit to interfering with Miller's orders. The Examiner would still fail to accept the merit of Riley's complaint before referencing out of context in protecting Waterman, "DAI Policy: 300:07 Appendix 1: "Medical restrictions / Special needs, HSU does not issue, purchase or authorize special shoes if the inmate is able to wear regular shoes (common shoes purchased for general wear via the approved vendors)..., If a patient is not able to wear the state supplied footwear due to a significant medical condition & an alternative off the shelf shoe is necessary, the facility shall provide an alternative." before elaborating these cases are to be very limited & determined on a case by case basis - through the (Special Needs) Committee / Nurse review"; is Miller capacity as a Doctor not greater than a Nurse where he would be more qualified to oversee such care? Of course it is, however, rationale & the code of ethic related to the Standard care was intentionally disregarded here. This assertion by the Examiner shows that a Waterman had been lying to Riley in claiming that HSU had nothing to do with personal shoes. In addition, the policy referenced by the Examiner shows Riley should have been allowed to purchase his own personal shoes as ordered as it was established for the record that Riley had been prescribed custom orthotics & couldn't occupy "regular" footwear. Furthermore, it's misapplication of the policy is established for the record where the Examiner asserted, "These cases are to be very limited...." How can the WDOC predetermine the amount inmates that it may provide adequate medical care to when the WDOC is bound to provide adequate, & effective care that is timely to ALL persons in its custody / care? regardless of whenever or however it is required for the WDOC to do so,

even if it means mediating/affording medical shoes to ALL its prisoners? It is clear that HSU/WSPF is using this policy for other than its intended purpose instead of allowing qualified medical personnel provide much needed care, where it's required. The Examiner would further assert that, "tennis shoes can be ordered according to property rules, & that exceptions can be made at the facility level & (not HSU), if special situations arise (at the intake phase on a prisoner's imprisonment) in dismiss recommending dismissal of this complaint. However, the Examiner's strategic attempt at making it appear that intake is the appropriate point for prisoner's to place the WDOC on NOTICE of the need for special shoes, shows that Riley in fact needs now to occupy immediately, his special medical footwear as Riley's life-long preexisting leg deformity is noted for the record & Riley was able to access/ occupy this very medical apparatus as general consumption for the first ten years of Riley's imprisonment (1999-2009), thus, Riley was adequately accommodated & had no need for HSU/DOC to immediate him occupying medical footwear as he had done so at his own expense. Once again, defendant Absum of the appropriate authorities did nothing towards addressing & correcting Waterman's ongoing act(ions) to assure that Riley had another thing coming, as Absum upheld the Examiner's recommendation to dismiss this complaint. Riley appealed this dismissal through aid of another prisoner via US mail but to no avail.

58. Riley had yet to receive his scheduled follow up with the Specialist & Riley's conditions continued to get worse. Riley's back complications had begun to effect & distort Riley's posture when laying, sleeping & especially whenever Riley stood, walked or the likeness. Riley had also begun to experience

neck pains. On August 30, 2017, Riley submitted a request to USArdle seeking treatment with the Specialist, & whatever care that was available through USPF for Riley's worsening conditions. On September 8, 2017, Riley was seen & evaluated by USArdle where Riley was diagnosed with neck pain, "caused by muscle spasms, present on either side of cervical spine: worse on right vs. left. Riley was instructed to apply warm moiste towels on his neck, & was refered to the Physician (PT) for evaluation & treatment.

59. Riley went without receiving his ordered PT evaluation or any treatment on his neck for more than an entire month (38 days), & on November 5, 2017, Riley filed a complaint against this specific deprivation that would progress to 1½ months of Riley grappling with neck pains before he would be evaluated & treated by the PT-therapist. As usual, in offering Riley no serious recourse, the Examiner reviewed the complaint with Waterman & relied on Waterman's ridiculous claim that 1½ months (w/ Riley being in pain) was the normal wait-time for a patient to be seen for a plapical-therapy evaluation, in recommending dismissal of the complaint. The Examiner further insisted on downplaying the matter as if it was an "initial evaluation" where treatment would not be prescribed, nor administered; thus, no denial of treatment never occurred. However, USArdle had previously "evaluated" Riley's neck & placed Riley's conditions on the record. as such, treatment was in order from that point on, otherwise a subsequent "evaluation" as asserted by the Examiner would be an admission of failing to provide Riley with medical care for injury & pain

Original complaint - page 35

that HSU was aware of. Again, Altoun turned a blind-eye towards this depilation that caused Riley to suffer in idle wait, where Altoun accepted the Examiner's illegitimately based recommendation to dismiss this complaint. Riley appealed the dismissal of the complaint but it was upheld with the Examiner citing, "PT evaluation only", & that the evaluation outcome noted no further Physical Therapy was needed. However, this was not the case, upon being evaluated, the Physician provided Riley with instructions to maintain a PT "home" exercise regimen to treat his injured neck, as Riley had completed multiple bouts of PT & possessed enough knowledge to maintain an independent regimen without the Physician. Thus, treatment was delayed for 1½ months, leaving Riley in pain; & this is why this complaint should not have been dismissed. PT "Home exercise" regimens are a form of care / treatment.

100.   On September 26, 2017, Riley sent a request to Miller, seeking information as to why Miller's orders for care; that Riley access/occupy Air Bubbled Athletic style tennis shoes & sandals, & socks; & that Riley be provided an herbal remedy for pains as described above, had been reduced to an order for Air Bubbled Athletic style tennis shoes & lower leg splints? However, a paterman, intercepted this request & spat at Riley (just what Riley suspected), "Discussed with Dr. Miller - reviewed your file. Mr. Riley, you purely circumvented the blue policy HSU does not purchase athletic shoes. You can purchase your own shower sandals & socks through canteen. There is no approval for herbal supplement Turmeric Turmeric

in the SDC" in verifying Riley's suspicion that Waterman had spoke with Miller about his August 15, 2017 orders before she ordered Miller to change them where Waterman still went behind Miller's & changed orders & undermined them further with her personal notes. Waterman falsely accused Riley of something Riley had no control of & continued to claim that Riley was requesting for HSU to purchase the shoes he had been prescribed while he has only sought to occupy them at his own expense.

161. On September 26, 2017, at a stagnant & painful dead-end with his exacerbating conditions & remaining without care, Riley submitted a request to McArdle grieving about the ill-adverse effects of his worsening conditions & also questioning McArdle's disturbing and reckless deliberate indifference in persisting in ineffective care (viz, pain medication, PT stmts, TENS unit, therapy bands, knee & ankles braces, ointments & all other care that McArdle (HSU) insisted & persisted that Riley take/occupy in place of the Specialist's orders after they (HSU) had designated Riley off site for care) McArdle hereof acknowledged, "you have an upcoming appointment with Podiatry & I recommend you discuss your problems with your feet with them." McArdle again acknowledged that the Specialist was better equipped to treat Riley & that Riley should address any concerns with them, yet, not only did McArdle persist in ineffective care subsequent to any/all off-site visits with a Specialist but McArdle refused to mediate Riley receiving the care that the Specialist ordered, even while knowing that it was the optimal care.

Original complaint - page 37

102. On October 13, 2017, Riley submitted a request to McArdle, grieving about complications with chronic/severe pain. RN Edger would respond to Riley in a similar tone of HSU's previous eager inquiries of "what, are you refusing care?" when Edger threatened Riley, "HSU could provide you with a recreation restriction (which had Edger had any intention to actually provide Riley with care, Edger would have checked the record & known that Riley had already been on a rec restriction for five months at this point) or cell confinement (which is the most popular punitive disposition for conduct reports related to prisoner misconduct), if it was too painful for Riley to walk about the housing unit or outside. Riley attempted to take HSU up on its offer, in requesting a "eat in cell" restriction as it was too painful for Riley to mobilize during out-of-cell activities. Riley's request was denied by the SNC, even while they were aware of Riley's serious medical needs. Riley filed a complaint against the denial of care that HSU had offered in the first place but this complaint was mishandled as it was never referred to the ~~Bureau~~ Bureau of Health Service (BHS) as a medical matter. The Examiner met with Waterman who informed the Examiner, "there was no physical or medical limitation requiring Riley eat in his cell". The Examiner recommended dismissal of the complaint of Waterman's bogus information (as she had previously acknowledged that Riley's Plantar Fasciitis was chronic), & Boughton accepted this recommendation for dismissal. Riley appealed Boughton's decision to no avail.

103. On October 13, 2017, Riley encountered inmate ~~Greg Atwater~~ (Atwater), who was housed two cells away from Riley on the same unit. Atwater was aware of Riley's medical conditions

& Riley being denied his ordered medical shoes. Atwater informed Riley that while he was consulting with an RN in the examination room, Waterman abruptly entered the room & began speaking with the RN amongst themselves before Waterman stated aloud, "Whatever you do, don't make any orders or notes about personal shoes, I'm in hot water about it" as she exiting the examination room. Atwater then volunteered to provide Riley with a declaration about what he witnessed.

64. In between Riley's second & third off-site Specialist visit, Riley continuously submitted health service requests to HSU, grieving about his conditions becoming worse, at one point, informing HSU that his pains had reduced him to tears, & that they had not only become physically overwhelming but that his chronic/severe pains had become mentally & emotionally taxing as well.

65. Finally, On November 17, 2017, six months later & five months delayed, Riley returned to Gunderson for a third visit with Jacobs (█████ 1st off-site Specialist visit subsequent to LaBelle's assertion, supra at ¶ 34.). Subsequent to Riley's physical evaluation, Jacobs questioned Riley about Riley's adolescent engaging in sports activities & the specific medical devices Riley occupied to accommodate Riley's life-long leg deformity of having an aversion of the feet. Riley explained to Jacobs that he had occupied corrective leg braces from the point of walking up until about age 10 where Riley then occupied different-styles of medical sleeves for his legs in combination with Athletic Air Sole style footwear up to age 12 before Riley was able to occupy said medical

apparatus alone & up until 2009 at which time Riley had to dispose of his overworn Air Sole footwear in the DOC. Jacobs explained to Riley that the Athletic Air Sole style tennis shoe was perfect for not only combatting the ill-adverse repetitive joint compression of Riley's malaligned leg joints but to combat Riley's now problematic flat feet & Plantar Fasciitis symptoms as well. In addition, Riley provided photos of him occupying his actual medical apparatus in the DOC. Jacobs noted Riley's pain during physical evaluation & documented Riley's aforementioned conditions before ordering that Riley occupy Air-type shock absorption footwear/Air Sole tennis shoes) as the optimum form of care for Riley's conditions, & encouraged Riley to continue with flexibility & stretching.

100. It was at this specific juncture that Jacobs left no doubt as to Riley's serious medical needs & what was required for adequately & effectively addressing or correcting these needs. Thus, given McArdle's assertion, "you're not getting any fancy shoes, I'm going to request another podiatry visit to see if that's necessary", supra at ¶39, (HSU/WSPF now had no legitimate reason to tactically delaying or denying Riley accessing/occupying his ordered care, no further than they had defiantly & unlawfully done already. Further, McArdle's assertion shows that HSU's unlawful defiance was unnecessary & that if McArdle was to mediate Riley accessing "fancy" shoes once the Podiatry deemed it necessary at Riley's third visit, McArdle (HSU) should have taken such position/action at Riley's second off-site visit. Yet, upon returning back to WSPF, Riley was met with the same deliberately indifferent tactics

from HSU.

107. On November 20, 2017, Riley received documentation of Jacobs' orders for care, which included McArdle & RN Tracy making note of these orders where Tracy notes made notes documenting Jacobs' orders for care for Riley's medical record, & McArdle, signed off on all of them, noting "herself," Pt. may order "(he prescribed Athletic Aid Sole tennis shoes).

108. On November 29, 2017, Riley submitted a request to McArdle, explaining that he was suffering from severe pain, basically from Riley's neck to his toes; & that the pain was mentally taxing to the point that he needed care in wait of occupying his medical footwear. Riley elaborated that his pains would become overwhelming in doing just about anything, viz., laying, sitting, standing, walking, running, performing PT regimen, attempting to pray (as a Muslim), & suchlike. RN Edger handled this request & apparently took notice to Riley's mentioning that he couldn't wait until he received his prescribed footwear, as Edger responded, "you have been given knee braces, night splints, ankle braces, a TENS unit, & a therapy ball (all ineffective devices towards Riley's serious needs), be sure that you are using ALL of those devices as they are ordered. HSU does not provide shoes for patients unless you are diabetic or severe foot deformity," while Riley has never requested that HSU provide purchase Riley's medical shoes but rather that they simply allow Riley to purchase his own medical footwear. Thus, given Edger's response, Riley should have been able to access & occupy his medical shoes for his aversion of the feet & being

flat footed. In addition, Edger's response shows that the "top down" approach (to assure that Riley had another thing coming) lead by Waterman, was actually taking place where it is clear given Waterman's own admission of having "discussed" Miller's orders to care for Riley, (see at supra P 60); that Waterman "discussed"/instructed Miller, the RN consulting with Atwater, Edger, likely several others, & later McArdle, to not make any orders for medical shoes.

69. On December 10, 2017, Riley filed a complaint against the denial of Jacobs' November 17, 2017 orders, alleging deliberate indifference; however, as usual, the Examiner's continuous position was to turn a blind eye to Riley's suffering & to protect Waterman & the integrity of work, as the Examiner met with the one person at the top of the "top down approach", Waterman; in demonstrating her inability to properly govern tribunal as a complaint examiner Waterman misled the Examiner, claiming that Riley's last offsite visit was his second one, for whatever reason. Waterman also by this time had "discussed" matters with McArdle who had now shifted from noting "Pt. may order" under "per offsite recommendation" (in Riley's medical file), to parroting what Waterman changed Miller's orders with, "you does not provide personal athletic shoes, you may order (your) recommended shoes from "catalogs", where Waterman provided the Examiner with the coerced response, & the Examiner recommended dismissal of this complaint; LaBelle failed to address & correct this matter as the RA.

70. On December 12, 2017, Riley sent a request to McArdle, questioning whether an aversion of the feet (causing chronic/ severe pain from malaligned leg joints) & being flat footed were severe leg deformities. Riley submitted this request in relation

to Edger's that, "HSU does not provide slue unless.... a patient has a severe foot deformity" (at supra Pf 68). McArdle responded to this request, "I will have you rescheduled with Podiatry so that you can ask these questions"; Podiatry is best prepared to answer your questions". Which was disturbing to Riley to be shown that the educated & trained personnel, who was responsible for Riley's well-being, could not provide an answer to a simple medical question. It was also all the more disturbing that McArdle eagerly referred Riley to an offsite Specialist, claiming that the Specialist was better prepared to answer Riley's questions; yet, McArdle continuously refused to mediate a timely follow up with the Specialist in between 5-5-2017 – 11-17-17 while Riley suffered as he continuously grieved to McArdle about his conditions becoming worse. McArdle's admission shows that the Specialist was "best prepared" to provide care to Riley. Thus, HSU/WSPF should have never refused the Specialist ordered care, nor should HSU ever attempted to provide care in place of the Specialist's care, especially where HSU had demonstrated this in off referring Riley to the expert due to their admitted inability to accurately diagnose or treat Riley.

71.     Defendant Ked, Riley sat out for explanations of HSU's actions where on December 14, 2017, submitted a request to McArdle posing the following questions: 1) Can't anyone in HSU answer the questions posed in my request dated December 12, 2017? 2) Why are you referring these questions to a Specialist? 3) Don't you have medical knowledge to answer these questions? 4) Approximately how long will it be before I'm able to consult with the Specialist? 5) Did it ever occur to you that I may have already discussed the questions posed in my December 12, 2017 request with the Specialist?

which Riley had actually done. & 6) why is your office following
every recommendation for care (made by the Specialist),
except for orders for my medical shoes? This request was referred
to McArdle but none in HSU ever dared to answer Riley's
questions as they had done in the past enthusiastically.

72. On December 19, 2017, Riley sent a request to McArdle, inquiring
about being seen for evaluation related to a possible "feed cell"
restriction as Riley had been told he would be seen but had
not been, & was disregarded in chronic pain that greatly
reduced Riley's mobility. This request was referred to McArdle with
no information provided to Riley's inquiry.

73. On December 20, 2017, Riley submitted three health service
requests, one questioning: "1) Just wondering, is it a medical
emergency for me to have mobility complications with chronic
pain in my lower extremities when attempting to go to & from
during out. Of. cell movements? 2) Shouldn't medical emergencies
be addressed promptly & at once, upon being placed on NOTICE
about them?" RN Tracy spot in response: "Sir, if your pain
was so severe, you would not attend recreation & do the activities
that you do. Please note when you write DOC 3035 (HSR-5) such
as "there we check-up on you "& your activity, you do. & if
you're hurting so bad, I can decrease your movement with
recreation restriction" while Riley had not been to recreation for
about five months at this point.

74. Another request questioning whether a medical condition was severe
when it caused chronic, debilitating pain. RN Tracy responded,
"would you like to be seen, yes or no?" while Riley had sent
requests inquiring as to why he had not been seen after being told

that he would be. Tracy stated/responded further, "Do you need a recrea-
tion restriction, yes or no? Let [HSU] know, we are happy to help
you decrease your movement to help your pain"; which was a
threat that served to deter Riley from requesting medical
services for his excerbating mobility complications, or to have Riley
on loss of recreation for seeking services. even while Riley
had been told that he would be assessed for a feed cell
restriction which is what Riley was inquiring about.

75.    The third request sent on December 20, 2017, sought HSU's
knowledge/position on the severity of Riley's Plantar Fasciitis,
having an aversion of the feet/medaligned leg joints & being
flat footed; where, given HSU's previous bones of retching
Riley to a specialist to present questions, or to simply ignore them,
Riley told HSU that the requested medical information was needed
as general information in order to present the request as being
unrelated to Riley's ordered care. However, Tracy in responding to all
of Riley December 20, 2017 requests responded, "It seems to me
that you are very knowledgeable, sir. You can look that up in the
law library. Unless it is teaching for meds & NEW teaching
to you, it is your responsibility to locate that information."
However, not only was it ridiculous for Riley to have been
refused information related to a serious medical condition but it was
"NEW teaching" to Riley as well as Riley was unaware as to exactly
what was going on with the severity of the severe conditions
the Specialist said he had.

76.    On December 29, 2017, Riley filed a complaint, alleging deliberate
indifference in Tracy threatening Riley with being happy to
decrease Riley's movement with loss of recreation in order to
deter Riley from seeking much needed care. This complaint detailed

that Tracy had access to Riley's medical file, plus, previous health service requests showing that Riley had requested for McArdle to lift his 90 day recreation restriction under the instruction of PT therapist, Krueger, who instructed Riley to go to recreation & walk around or perform some of his PT regimen as long as it didn't become too strenuous. & that Tracy based said threat off of that knowledge (of Riley's request). Even though Riley was physically unable to attend recreation, he still needed access to the recreation space & equipment to exercise in moderation whenever he was able to do so.

77. In receiving no recourse through filing a complaint, Riley was met with the tiring hollow formality tactics of the Examiner contacting the perpetrators, who would obviously protect themselves in being investigated for misconduct. & in contacting Waterman, Waterman informed the Examiner that Tracy's responses were appropriate while it was the Examiner's responsibility to determine that. Waterman fabricated that Tracy's responses educate Riley on how to help alleviate pain while they did not, & they in fact prevented Riley from receiving information that would have been educational & useful to him. Waterman told the Examiner that Riley was seen by McArdle but withheld that it was regarding evaluation for a "possible feed cell" restriction, & that a recreation restriction had little to do with alleviating pain. At Riley's visit with McArdle, Riley's "feed cell" request was referred to the SNC for review. & Riley was scheduled an offsite visit with the Orthopedic for knee pains as well. The Examiner never contacted Tracy in gathering all relative information before recommending dismissal of the complaint, & Alsum failed to take the appropriate action in accepting the Examiner's recommendation. Riley appealed further to no avail.

78. On January 4, 2018, Riley sent 2 requests to McArdle, one seeking an approximate date as to when Riley would see the Specialist. PN Edger would not refer this request & dismiss Riley in responding, "1 year", which was a lie, unless HSU intended to allow Riley to suffer in being untreated in idle wait, again. The other request questioned whether or not Plantar Fasciitis, being flat-footed & having an aversion of the feet were severe foot conditions. Riley explained that he could not find this information in the library. Edger responded to Riley & spat, "you do not have a diagnosis for those conditions, ... you are not at risk of losing this extremity" & "Plantar Fasciitis is not a severe foot condition, while Waterman seem to think otherwise as Waterman had told Riley", "Plantar Fasciitis is a chronic condition, it is not easily treated (see supra at ¶ 56). In addition, Edger provided Riley with information on Plantar Fasciitis (which underminded Tracy's refusal to provide Riley with medical information: supra at ¶ 75).

79. The medical information that Edger provided Riley with was about Plantar Fasciitis, & needed to be examined & no further than page 2 of "Treatment" where it detailed that surgery may become necessary; to understand the seriousness of this condition. Where Edger over time had handled many of Riley's medical requests where Riley continuously grieved about being in severe pain as his conditions became worse, Edger had to have known that Riley's Plantar Fasciitis was at an advanced phase. Edger had also received Riley returning from an offsite visit with the Specialist where she noted the offsite orders for care in Riley's medical file.

80. Further, the medical information detailed nearly everything

that Riley continuously grieved to HSU about; viz., pains &
symptoms listed under signs & symptoms; Riley's attempts
& pleas to contact the Podiatrist due the increase of pain;
pain developing in Riley's hip, knees & back; & Riley having questions
& concerns about his conditions & care. The medical information
also provided that a patient must wear slides that fit well & support
your arch while Jacobs made 11·17·17 notes that Riley's footwear
did not. The medical information further instructed one to, "replace your
shoes before the padding or shock absorption wears out (which
shows that the shock absorption air sole tennis shoes
that Jacobs had ordered for Riley was in fact what Riley
should have been occupying as the optimum form of care). &
"Do not walk or stand in bare feet or sandals for long periods
of time "(which is exactly what Riley is compelled to do everyday
on concrete prison surfaces as Riley occupies a sandal all
day long unless Riley is performing his "home" PT regimen in cell
or is able to mobilize for an out of cell activity). This
shows that HSU possessed this specific knowledge of Riley's
chronic Plantar fasciitis, yet, HSU refused timely visits with the foot
Specialist & subsequently refused the Specialist's orders for care
while the Specialist & the medical information (viz., HSU knew)
instructed, "the shoes should fit well & support the arches,& should
have shock absorption", just as Riley had occupied prior to & during
imprisonment, & also prior to ever experiencing any complications with
chronic/severe pain. However, defeated by the Examiner's complaint
processing attics, Riley was detered from volunteering to engage
& the firing process & declined to file a complaint
against Edgar's deliberate indifference. But the integrity of HSU
is clear for the record that its personnel pushes collectively pushes
an unethical agenda of malpractice.

Case 2:20-cv-01253-pp Page 48 Filed 08/14/20 Page 48 of 87 Document 1

81. On January 22, 2018, as Riley had been scheduled to be seen when he inquired about when it would be before Riley was dismissed by Tracy & Edger, Riley was finally seen by McArdle to be evaluated for a "dead cell" restriction & other necessary care. McArdle evaluated Riley & determined that Riley was suffering from chronic feet pain & the bilateral knee pain. Riley told McArdle that his pains & complications existed & were becoming worse before he was not occupying the prescribed footwear that best accommodated all of Riley's serious medical needs. McArdle would respond to Riley, "I have something even better than those fancy shoes .... Apex shoes." Riley questioned, "What are those?" & McArdle informed Riley, "Oh, you'll like them — they work for a lot of guys." Riley then questioned why McArdle would insist on forcing Riley to occupy lesser ineffective treatment while she knew that the Specialist's care was the best care available for Riley's serious medical needs? McArdle responded, "Because the DOC won't allow the Specialist treatment" & then elaborating, "I'm scheduling you for a Specialist visit to evaluate the need for Apex shoes whether you like it or not!" Riley then attempted to request that McArdle check Riley's medical record to verify Riley's need to occupy the specific Air Sole Shoes Absorption style footwear that Jacobs had ordered for Riley to occupy but McArdle continuously interrupted Riley, "Nope. Nope. Nope." Silenced, pushed aside & powerless in the matter, Riley abruptly exited the examination room. In addition, McArdle, in her continuous efforts to finally have a difference of opinion with another Specialist asserting that medical footwear that had been prescribed to Riley was unnecessary. McArdle tactically scheduled Riley for a visit with an Orthopedist for Riley's bilateral knee pain & the need for Apex shoes, while McArdle noted/acknowledged Riley's chronic feet pain, which

Original Complaint 252 Pg 49   Filed 08/14/20   Page 49 of 87   Document 1

was the focal point of all of Riley's serious medical needs an Riley's aversion of the feet malaligned his leg joints, causing (the bilateral knee) pain; & Riley's Plantar fascitis & (flat feet) collapsed arches, all were in/of Riley's feet. Thus, if Riley's feet were treated it would mitigate or correct pains elsewhere in Riley's lower extremities.

82. On January 23, 2018, Riley filed a complaint against McArdle's January 22, 2018 actions, alleging deliberate indifference towards Riley's serious medical needs. This complaint detailed that McArdle distorted/fabricated medical records in documenting that Riley's bilateral knee pain was Riley's chief complaint in order to overlook the conditions of Riley's feet (viz., having an aversion of the feet causing malaligned leg joints, having collapsed medial arches & Plantar Fascitis). Which was causing Riley's knee pains. Riley elaborated that McArdle's actions would allow McArdle to order care on Riley's knees while such care leave Riley's feet unaddressed & would also circumvent Riley's own ordered care towards Riley's chief medical issue/condition, which is what HSU had done up to this point. Riley also complained against McArdle's actions of ignoring Riley's concerns during their January 22, 2018 consult. Riley also complained against McArdle persisting in ineffective care in place of Riley's ordered care that served as the optimum care plan for Riley; & of all people knowing that the Specialist was "better prepared" to provide care for Riley, McArdle would be one of the first to know & profess this, as she has made it clear for the record.

83. Where Riley felt silenced, pushed aside & powerless during Riley's January 22, 2018 consult with McArdle, the

complaint examiner wanted to make sure of that as the Examiner "didn't want to hear it" in REJECTING Riley's complaint as "previously addressed" while it dealt with Riley's January 22, 2018 consult only, no other incident before it. The Examiner claimed that Riley had filed a complaint against this matter on December 10, 2017 while those are two seperate incidents/complaints, yet, Boughton accepted the Examiner's recommendation. Riley appealed the matter to LaBelle who turned a blind eye & upheld the rejection of the complaint.

84. On January 24, 2018, McArdle acted on NSU's shocking & disturbing practice of tampering with/distorting & fabricating medical records ( just as McArdle's Manager (Waterman) exemplified & encouraged McArdle to do), when McArdle (unbeknownst to Riley) fabricated that she had cancelled Riley's January 22, 2018 referral to the Orthopedic because Riley's knee pain had been treated while it had not been.

55. Under the impression that he would be seen by the Orthopedist, Riley sent a request to NSU grieving about his conditions becoming worse; this request was sent on February 27, 2018. Edger responded to this request: "you were seen on January 22, 2018. According to your plan of care, you are being refered to Podiatry & Orthopedics (which would suggest that NSU "plan" of care was to allow the Specialist to provide care to Riley, only to continuously refuse it). You will be placed on provider appointment list; however, it may take greater than two weeks to be seen"; this response was made on February 28, 2018.

86. Where Edger referenced the fabricated record, Edger had

to have noticed that McArdle had cancelled Riley's Orthopedic visit, as McArdle's fabricated cancellation note was noted immediately underneath the original January 22, 2018 referral that Edger was referencing to Riley. Yet, Edger overlooked McArdle's fabrication in responding to Riley on February 28, 2018. However, after still not having seen the Orthopedic or the Podiatrist, Riley submitted another request to HSU on March 12, 2018, grieving his conditions worsening & being denied care. Edger responded to this request: "You have been referred to Podiatry ... " & never now, never mentioning the previous Orthopedic referral as Edger had done on February 28, 2018; showing that Edger noticed McArdle's fabricated note in cancelling Riley's Orthopedic consult, & that Edger provided Riley with false information on February 28, 2018.

87. It is evident that McArdle fabricated Riley's medical record on January 24, 2018 by cancelling the Orthopedic visit under false pretense & then scheduling Riley to see the Podiatrist in relation to Riley's January 23, 2018 complaint (see at supra ¶ 82). Though McArdle's problem was admitting wrong as related to Riley's January 23, 2018 complaint, where McArdle did not want Riley's deliberate indifference claim affirmed. McArdle under said circumstances still could have simply changed Riley's Orthopedic visit to into a Podiatry visit & left it at that. Yet, where McArdle insisted on fabricating medical notes in relation to dispensed care, it reflects McArdle's integrity; which reflects that McArdle's initial January 22, 2018 Orthopedic referral was to divert from Riley's feet issues/needs; thus, entertaining Riley's accessing/occupying his ordered care. Further, it is evident that Edger was aware of McArdle's actions when Edger responded to Riley with false information; thus, showing Edger's integrity as a care giver as well.

88. On March 17, 2018, Riley was seen & evaluated by McArdle, who determined that Riley's conditions were in fact becoming worse as Riley had been grieving to HSU. McArdle informed Riley, "I'm gonna reschedule you for an Orthopedic consult". Riley immediately questioned McArdle, "reschedule, ain't I already scheduled to see the Orthopedist?" McArdle informed Riley, "It was cancelled". Riley again questioned, "cancelled, by who?" McArdle then downplayed her actions in responding to Riley, "Don't worry, you're scheduled again". At this time, Riley was unaware if who was responsible for cancelling his Orthopedic visit & leaving him suffering in pain without care. Riley then went to review his medical records & see that McArdle had cancelled the Orthopedic visit & lied about having provided Riley care while Riley was in fact suffering as McArdle would verify before rescheduling the Orthopedic visit. Riley was deterred from the the antics of the complaint

89. process & declined to deal with it as it relates to McArdle & Edger's action here.

89. After McArdle moved to cover up her unlawful tracks, on March 23, 2018, Riley was informed by escorting officers that he was going off grounds for a Specialist visit in Boscobel (Gunderson). In returning back to Gunderson, Riley was under the impression that he was finally having his visit with Specialist Jacobs as Gunderson was the site of all other visits that Riley had with Jacobs in the past. however, Riley was greeted by Orthopedist, Edward Riley (Dr. Riley) shortly after entering Gunderson. That fact that Riley was seeing the Orthopedist 6 days after McArdle told Riley that she was rescheduling Riley's visit, shows HSU's ability to afford its prisoners such service.

Original complaint 1292 JP Filed 08/14/20 Page 53 of 87 Document 1

which shows that every delayed off-site visit that Riley was subjected to was unnecessary, especially as Riley was in fact suffering. The prompt visit also reflects the extent that Riley had been suffering when Riley consulted McArdle 6 days earlier. This visit would also be Riley's 2nd off-site visit with a specialist subsequent to LaBelle's assertion, supra at ¶34.

90. As Riley was being evaluated by Dr. Riley, Riley explained that he thought he would be coming/returning to Gunderson for a follow up with Jacobs regarding the worsening conditions of his feet. Dr. Riley responded, "NO. I'm an Orthopedist, I'm here to address your bilateral Knee pains but, have you been seen before?" Riley responded, "yeah, but for my feet issues, which is causing my Knee pains, & Jacobs made the same diagnoses & orders on three different visits." As Dr. Riley shifted from evaluating Riley's Knees to examining reviewing Riley's file, Riley elaborated, "Everytime Jacobs has ordered care, the prison has refused to allow me to have it." Dr. Riley then questioned, "What?! Why would they do that?" as Dr. Riley continued to review Jacobs' three previous evaluations, diagnoses & orders for care on Riley. Riley explained WSPF's denial of his ordered care, & moments later Dr. Riley informed Riley, "Yes these conditions (of your feet) can cause Knee pains, & other pains, especially when left untreated". Dr. Riley, appearing baffled at what Riley explained to him & what Riley's medical records showed, finished evaluating Riley before ordering the following: "Follow Recs (recommendations) outlined by Dr. Jacobs in his 11-18-17 notes. Pt. has several foot diagnoses. Help him get the recommended footwear per Note of 11-18-17. MUST purchase

Athletic Air Zole style tennis shoe, from outside vendor beyond general property regs (regulations) as (his) "medical conditions" are specific to patient". Dr. Riley then read aloud to Riley what he had ordered before instructing, "Yeah, keep complaining until you get this care, don't sit in silence while you suffer". McArdle noted these orders on 3-23-18.

91. Upon returning back to WSPF, Riley was received with HSU's continuous efforts to assure Riley that he had another thing coming. On March 23, 2018, instead of appropriately referring Riley's ordered care to the ONC for approval, McArdle disregarded Riley's serious medical needs & replaced Riley's optimal plan of care with ordering Riley to occupy APEX state issued footwear while McArdle knew that any care that she issued in place of the Experts would make Riley's conditions worse as Riley could not just simply occupy his custom orthotics in the wrong sizes (see supra at ¶ 32). Further, under "Prescriber's Orders" where off-site orders are commonly not in one's medical file, McArdle, true to HSU form, fabricated Riley's medical orders/record by inserting her own orders for Riley's feet to be measured for occupying one pair of APEX shoes to accommodate Riley's custom orthotics.

92. On March 24, 2018, Riley was measured for occupying APEX footwear. However, Riley would never be issued this footwear by WSPF's HSU. Where Riley feared injury in making his conditions worse by occupying the wrong shoes/custom orthotics in the wrong shoes, Riley never volunteered to place HSU on notice about never being issued the harmful footwear. However, the fact that HSU did order this care & measure Riley's feet, only to disregard & never provide the care to

Riley; thus HSU's disregard for not only expert Specialist care but for their very own care as well. HSU continuously persisted in care that was ineffective, & even in care that would be harmful to Riley; in preventing Riley's optimal care. HSU continuously demonstrated & documented that they had no desire at all to provide adequate & effective care for Riley's suffering from his serious medical needs.

93. On April 20, 2018, five months after his last visit, Riley was finally seen by Jacobs. As soon as Jacobs entered the examination room, Jacobs question Riley, "What are you doing here again?!" Riley answered, "I'm falling apart, man. I'm hurting". Jacobs then questioned, "Are the orthotics working with the Air Sirkes?" Riley answered, "They (WOPF) won't even let me buy the shoes with my own money". Jacobs then questioned, "Well, why would they continue to send you here for treatment that they're refusing?" Riley responded, "I don't even know". Jacobs then informed Riley, "I know you're in a lot of pain but we're not gonna do evaluation today, I'll simply reference the record & that should be more than enough". Riley then objected to Jacobs that WOPF continued to dismiss his recommendations as mere recommendations that they didn't need (not have to, need to; viz., that Riley didn't even need the care that the experts continuously ordered for Riley to occupy), to follow). Jacobs, along with the erroneously present escorting officers, almost simultaneously responded to Riley, "Those (recommendations) are orders" before Jacobs reiterated, "No. Recommendations must be followed". Jacobs went on to reference Riley's medical record related to all previous Specialist visits before providing to HSU that: "3 different physicians

(Jacobs, Dr. Riley & Miller) had ordered Air-filled (Air Sole)
Athletic style shoe gear as patient has utilized this
specific "shoe gear as noted without symptoms". Jacobs
ordered a care plan for Riley to occupy his custom
orthotics in combination with Air-filled (Air Sole) Athletic
shoe gear & sandals, from an outside vendor, to be purchased
at more than the $75 general (non-medical) property
guidelines. This off-site visit with the Specialist was
Riley's 3rd visit subsequent to LaBelle's assertion, see supra
at ¶ 34.

94.     After receiving the same diagnoses & orders for the
best care, Riley returned back to WSPF, only to be confronted
with HSU's continuous deliberate indifference of leaving Riley
without any meaningful or effective care while refusing the
best care available to Riley.

95.     With having no effective care, Riley was compelled to
notify (HSU) about his worsening conditions. On May 8, 2018,
Riley sent a request to HSU questioning: 1) I am (still)
having level 10 pain complications from Plantar Fasciitis,
having an aversion of the feet & being flat-footed, What
should I do? 2) I was sent off-site due to your
(HSU) inability to provide adequate & effective care; yet, when the
off-site Specialist, acting as the sole Provider, diagnosed
me with the aforesaid conditions & then made out
specific orders for care, Why have your office denied me this
care? Riley then asserted: 3) HSU has admitted/demonstrated
an inability to provide me with adequate/effective care, yet,
where I still have level 10 pain; yet, HSU has prevented
the adequate/effective care (that best treats me) that HSU

pretended to mediate for me to receive.... I NEED CARE
TODAY! " This request was responded to by McArdle on
May 9, 2018 asserting: "you are allowed to purchase any
personal athletic shoe you prefer from the catalogs. Many
of the athletic shoes available through the catalog would
address Plantar Fasciitis". McArdle not only ignored Riley's
complications with having an aversion to the feet & collapsed
medial arches but McArdle ignored the fact that Riley
had been occupying the catalog footwear for 9 years at that
point, & the inadequate catalog footwear may have contributed to
Riley's Plantar Fasciitis; one things for sure, the footwear
was not accommodating any of Riley's conditions.

96.  Disturbed by McArdle's dismissal of his serious medical
needs/conditions, Riley sent HSU another request questioning:
"If the catalog shoes addressed my Plantar Fasciitis, the
Plantar Fasciitis complications would not persist nor become
worse as they continue to do; viz., the disturbing/aggressive pain
in my heels, in the bottom of my feet, achilles, knees, hip,
ankles & lower back. the bottom of my feet (arches & heels)
frequently & spontaneously locking up (spasms) that debilitate me).
I occupy two different (supposed to be) athletic pairs of shoes
from the catalog, why are my Plantar Fasciitis complications
worsening?" McArdle responded to this request, "The
athletic shoes available through the catalog should be adequate,
the Podiatrist did not send you to Orthotics lab for special
shoes or inserts". Riley could only shake his head in
disbelief of McArdle's baffling response as custom
orthotics in combination with specific medical footwear is
exactly what Jacobs dep ordered for Riley to occupy.

97. On May 10, 2018 sent another request to McArdle, questioning: "I raised level 10 pain complications being caused by my diagnosed medical conditions, upon never informed me what could be done about these torturous complications, what should/can I do where HSU's care is ineffective while HSU continues to outright refuse the specialist care being received by me?" McArdle again instructed Riley to occupy footwear from the catalogs while McArdle knew Riley could not wear his orthotics on the wrong shoe; & McArdle was also aware that Riley was suffering chronic/severe pains in having been denied his ordered medical apparatus.

98. On March 10, 2018, Riley sent a request to McArdle, informing McArdle that he was aware that HSU had been falsifying his medical records by documenting that Riley was seen (without evaluation) & that Riley appeared to be in no pain & had good posture. Riley explained to McArdle that his HSU consults are routinely brief (5-10 minutes) & that his pain complications are more severe than it is at other times, pending activities. Riley elaborated that he had actually demonstrated & showed McArdle painful cracking noises that was being caused by Riley moving his leg & feet in a common manner but that this was never noted in Riley's medical file along with other painful demonstrations that Riley had shown to McArdle & the PT physician, Krueger. Riley explained to McArdle that he can only report the complications that he experienced & what HSU did with that information was out of Riley's control. Riley then informed McArdle that he would not come to HSU & pretend the extent of his pain if it isn't present but that he did expect for his reported/demonstrated complications

to be noted in his medical file, just as the misleading fabricated notes are, of course, given McArdle's HSU's integrity to falsify Piley's medical record in the first place, documenting Piley's actual suffering at every instance was unlikely. Piley also expressed that he had no faith in HSU's desire nor ability to provide him adequate/effective care, given HSU's many off-site referrals due to HSU's inabilities, & then subsequent refusal of Specialist orders for care. While anyone being falsely accused of such a thing, or anything for that matter, would have objected to baseless allegations being leveled against them, especially in this instance, however, McArdle nor anyone else at HSU disputed Piley's allegations of McArdle & HSU personnel fabricating medical files/records. McArdle in fact simply responded to Piley's allegations, "you will be seen," in response to Piley pointing out a 2-month delayed consult.

99. On May 13, 2018, Piley sent McArdle another request providing the following: "I raised the fact that I had been scheduled to be seen by your office for longer/more than two months without being seen in order to reason with you why I have NO FAITH at all in not only your ability to provide me with adequate/effective care for the four conditions that the Specialist (who you referred me to for evaluation, diagnosis & care) has diagnosed me with, but I also have NO FAITH in your desire to provide/mediate the necessary care in this specific instance. Further, I doubt that you/HSU would have ever scheduled me to be seen by HSU had I not reraised the denial/delay. I don't mean to be rude or disrespectful; however, this is an ongoing dire medical matter where I am in continuous chronic, debilitating pain; in large part due to you/HSU preventing the Specialist care, only to turn around & have me scheduled to see you/HSU again while I was referred off-site due

for care due to your #NSU's inability to provide it. I ask; given your past referrals off-site, the offsite diagnoses & orders for care, & your #NSU prevention of that care. what can/will your office provide me with in relation to adequate le-ffective care for my serious medical needs in this instance? I need yesterday, to receive the ordered care that was ordered by the "specialists" that you referred me to due to your inability to provide care, & thus, due to the specialist's specific knowledge & skillset to do so. I cannot make use of tactical, repetitive talk & exchanges that'll leave me suffering without the care that "your experts" ordered as optimal; viz., anything else is less than adequate or useless attogether". McArdle, again demonstrating her #NSU's inability to provide care for Riley's serious medical needs responded, "I will put in for second "opinion. That must be OK'd by a committee. I will let you know." & again only shoes available from catalog are "allowed per DOC policy*". Furthermore, McArdle had overstepped her second opinion referals as McArdle was in fact shopping around for a difference of opinion in an intentional manner, as McArdle had already sent Riley to Jacobs 3 times, & to Dr. Riley, & was now preparing to send Riley out again.

100. Riley would be informed that he would be next going to the University of Wisconsin — Madison (UWM) for his "second opinion", one of the leading premiere institutions for developing & practicing medicine. Riley hoped that given UWM's medical prowess & credibility, that WSPF would honor whatever UWM's opinion was!

101. Agonizing in pain from his worsening conditions, Riley

sent McArdle a request, hoping to be seen at UWM right
away as opposed to "another painful, prolonged delay.
Filed plead to McArdle," I-I was sent off-site to the Specialist;
diagnoses were made & treatment has been set in place
for me to receive but this place is refusing the ordered care;
what am I to do? I ask because my pain complication
are too much. I am having continuous clinic pain from that
both achilles, down to both heels; my feet are locking up
(from underneath the center of my feet to the heels of
my feet); & there's excruciating pain atop the right foot,
especially in applying pressure on it. The Naproxen,
braces, wraps, creams, etc., are simply not enough in this
instance. 2) Hou cannot treat me anymore effective than the
Specialist; What should I do?" Bill Edger would respond,
"New order received for second opinion, appointment is pending",
leaving Riley's concerns unaddressed & to be dealt with by
UW-Madison.

102.     Needing answers to his concerns, Riley sent another
request to McArdle detailing the same concerns from
this last request. McArdle responded, "Recommendations from
Specialists are just that — recommendations. The Doc has a
shoe policy which applies to all inmates. I will recommend that
you exercise to strengthen your feet/ankles, that you use the
exercise ball for your feet; you may ice feet with order. Disturbed,
Riley could only state his head in disbelief that he was at the
mercy of such disregard from those who were responsible for his
well-being. Where HSU continuously evaluated Riley & determined
that Riley's worsening conditions required specialist care, only
to subsequently refute the Specialists orders for care; left
Riley was defeated & left to suffer in chronic/severe pains while

trying to adjust to a mentally & emotionally taxing inactive lifestyle that Riley had endured for two years & one month thus far.

103. On June 14, 2015, Riley sent a request to McArdle inquiring: "1) Have have ordered a second opinion at UWM, what about the four previous Specialist visits that I've been to already? 2) Will you+HSU/WCPF honor UWM's services/ orders for care for my serious medical needs?" McArdle would tactically respond, "You asked for a second opinion (as though McArdle/HSU wasn't shopping around for a difference of opinion, nor continuously sending Riley offsite for care only to refuse it & allow Riley to continue to suffer eventime), about your ongoing problems with your feet (lie #1). Any recommendation made by Specialist are received & fulfilled if allowed by DOC policy, formulary concerns, & security concerns(lie #2 as several inmates occupy the specific orders) for care that has been made for Riley to occupy as the optimal for of care).

104. Riley never request* a "second opinion", in fact Riley questioned the need for any other opinion outside of the opinions that Riley had already received when he questioned McArdle, "what about the four previous Specialist visits that I've been to already? The fact is evident that McArdle was shopping around for another expert to undermine & undo the previous experts opinion & orders.

105. In shopping around for an opinion to undermine & undo the diagnoses & ordered care that Riley was to receive, HSU sent Riley to UW-Madison, a premiere institution for developing & applying/practicing medicine in the

United States of America. This would be the 6th off-site visit with a Specialist where Riley would be evaluated, diagnosed & ordered care from three different experts (Dr. Jacobs, Dr. Riley & Dr. Smith at UWM, not including WSPF's Dr. Miller).

106. On July 11, 2018, Riley was received at UW-Madison where Riley was evaluated & treated by Podiatrist, Ms. Audra M. Smith, DPM (Smith), who exchanged with Riley about his pains, his previous visits with Specialists, his subsequent mishandling by WSPF, & what medical footwear works best for Riley's conditions.

107. Smith provided, "On physical exam of his lower extremities, the integument is warm, dry & supple. There is some mild edema at the plantar medial arches bilaterally & he has got tenderness to palpation along the medial band of the plantar fascia, also at the insertion of the Achilles tendon bilaterally & along the posterior tibial tendon course posterior to the medial malleolus. Negative Tinel sign of the tibial nerve. No pain with side-to-side compression of the calcaneus & he has got decreased ankle joint range of motion with knee extended. It is improved with the knee flexed & he does have decreased medial arches bilaterally. He has palpable pulses & good capillary refill time. Strength in the feet is 5 out of 5. He is able to perform a heel raise test, but there is a lot of pain, right greater than left, along the medial arch & Achilles on the right side," in determining that Riley had Plantar Fasciitis (bilateral), Achilles Tendonitis, posterior tibial tendonitis & bilateral foot pain. Smith also note, "Has progressed to Tendonitis as well"; viz. that Riley in fact had been suffering in chronic/severe pains while his conditions becoming continuously became worse

in being denied adequate/effective care. Smith also determined that Riley had collapsed medial arches in both feet. Riley informed Smith that he was in pain that measured a 7 out of 10 rate but that the pains are regularly & spontaneously as aggressive as 10; viz, overwhelming & debilitating.

108. Smith's plan of care specified, "1) Please allow to wear personal athletic shoes at all times including off-site visits. 2) Allow him to order shoes from outside vendor (catalog) that are stability shoes & put his custom orthotics in them. 3) No Barefoot Walking (which is essentially what Riley is compelled to do for the majority of his day in occupying sandals from the approved catalog(s). 4) Footwear can exceed #75 limit as needed 5) Ice daily 2x a day, 10-15 minutes. 6) Naproxen 2x a day PRN pain. 7) If not improving may consider injection (steroidal) or MRI (which is what Riley actually requested). 8) Once receive appropriate shoes & inserts then start physical therapy 9) Stretch 3x a day, lunging fashion. Smith informed Riley that once he occupied his needed footwear that he would be able to rehab & return back to playing basketball on any surface, something Riley had not been able to do for more than one year at that point. In making these orders, Smith specifically warned (#5) & placed them on direct NOTICE

104. that, "Really, this is about proper support & until he gets the right shoes & inserts, this pain will not go away & it will continue to get worse. He is even complaining about shin & back pain now & knee pain just from the way he has been walking. Shawn inquired about imaging & I (Smith) discussed that typically I would not order an MRI at this time as he has not been able to fully

utilize his conservative care, meaning he does not have the proper sleves & inserts yet". Smith did not evaluate Filey beyond the abovesaid diagnoses as Smith referenced Jacobs' consult from 90 days earlier in relation to Smith's evaluation & diagnoses; & assured Filey that the abovesaid conditions were more than enough for Filey to access/occupy (his) medical footwear. Smith further informed Filey that longer delays &/or denial of adequate/effective care for Filey's serious medical needs, carries significant risk of irreversible injury.

109. Filey's UW-Madison visit was the 10th off-site Specialist visit subsequent to LaBelle's assertion that, "A recommendation from an off-site Provider is not an OPDER that the CDC is obligated to follow", these off-site Specialist visits includes two visits concerning nerve (damage) testing on dates June 26, 2017 & August 28, 2017, leaving one to question why would HSU & the SNC continuously designate Filey off-site only to continuously refuse Filey's ordered plan for care?

110. Upon returning back to WSPF with the umpteenth opinion, diagnoses & orders for care being aligned with all previous opinions, diagnoses & orders for care, Filey was hopeful that he would now access/occupy his medical footwear & finally have relief from his chronic, debilitating pains, as HSU & the SNC (who approves/oversees all off-site referral(s) were now on further NOTICE that Filey's conditions in fact had worsened (to

Original Complaint — Page 66

Tendonitis) as Riley continuously grieved & complained to HSU). & that Riley's conditions would in fact continue to worsen if Riley remained without adequate/effective care, placing Riley at significant risk for irreversible injury.

111. However, where Riley was denied access to every single order for care that was made by Smith, with the exception to a naproxen pain medication prescription that Riley had already occupied in excess HSU) & the SNC made it clear as to why they continuously designated a suffering Riley off-site for care that they were aware that Riley needed, only to flat out refuse it to Riley later; it was because HSU & the SNC were in fact slumping around for a difference of opinion, as none of Riley's orders for care were provided to him; slumming that HSU & the SNC would only take their previous actions of refusing Riley's care & allowing Riley to suffer while they continuously slumped around for a difference of opinion to justify their actions, but their deliberate indifference would never be justified by any of the experts that they slumped a suffering Riley around with.

112. In complaining against the denial of all orders made by Smith, HSU would admit their disregard for Riley's ordered ice restriction only to provide Riley with a 2X ice (pack) restriction for a couple of days.

113. However, not only did HSU refuse Smith's orders for care but they insisted on acting in direct opposition to Smith's orders where on July 31, 2018, Riley was seen by

USAF's PT physician, Krueger while Smith gave specific orders to: "Once appropriate shoes & inserts are received by Riley, then start physical therapy". That Riley was not with Krueger's superficial handling, only to conclude, "I'm sorry, I can't do nothing for you, nothing's working". Upon being evaluated, Riley grieved about chronic, debilitating pains in his achilles, the bottom of his feet, his right knee, hip, back & having debilitating muscles spasms that caused Riley's shins & the bottom of Riley's feet to lock up & reduce Riley to being on his back, immobilized for 10-15 minutes at each occurrence. These spasms would also wake Riley from sleep at times, & they occurred regularly & spontaneously. Riley told Krueger that her previous diagnoses of Riley having a strained I-T band had worsened to a disturbingly painful tightness going from the center of Riley's lower back & around through Riley's the right side of Riley's waistband & down to Riley's upper right hip, preventing Riley from being able to stand up straight, causing poor posture, thus, other back pains. Riley elaborated that if he rested his feet, sitting, laying, or standing, for approximately five minutes, that he would experience severe pains in the location of his feet that rested against hard (floor, etc.) or soft (mattress, & suchlike) surfaces. Riley grieved about being unable to perform the "home exercise" PT, regimen, daily prayers among other once routine activities. Riley grieved about the noticeable decrease in his muscle mass & gaining weight in being unable to perform his personal work-out regimen along with basketball (which Riley had done since age 10; organized & recreationally). Krueger then responded to Riley's grieving — flat out: "I'm sorry, I can't do nothing for you, nothing's working". Riley then questioned, "How can I accept that, Ms. Krueger?" Krueger

shrugged her shoulders in response. Riley returned to his housing unit with all that Kruger could offer for his serious medical needs — nothing(but the chronic chronic/severe, debilitating pains that Riley continuously suffered from).

14. On July 14, 2018, just as Riley had inquired to McArdle (RN) as to whether or not they would honor UW-Madison's orders for care prior to his visit with Smith, Riley submitted another request to McArdle questioning: 1) "Had the second opinion, same diagnoses, same orders, can I now purchase the proper shoes from an outside vendor?" 2) "If not, why?" 3) "Your refusal to mediate this specific care, as you have with other orders made by specialists, has left me without effective care & suffering in chronic pain. Does that matter to you?" McArdle responded, "Unfortunately not. As I have told you in the past, DOC policy does not allow the purchase of shoes from outside providers; your only option is to appeal to the Warden for exception of the rule.

15. On July 16, 2018, Riley submitted another request to McArdle questioning, "Wouldn't it be more appropriate & effective for you to appeal the denial of my ordered care to the Warden — given your knowledge & skillset & awareness that I need this specific care? Will you take action?" McArdle responded to Riley's request on July 17, 2018, informing Riley, "As I have explained, the rule concerning the purchase of shoes from an outside vendor is a security rule, not an (DOC) rule; thus, only the Warden may waive a security rule.

116. McArdle demonstrated/showed that she (HSU) had been lying & misleading Riley all along, claiming that, "the DOC does not allow inmates to purchase a medical apparatus in the form of Athletic Air Sole footwear from an outside vendor" before stating, "the rule is a security rule, not an HSU rule". admitting to have allowed non-medical staff prevent Riley's care while security is severely unqualified to practice medicine in this matter; even medical personnel at HSU referred Riley to specialists who were better equipped/trained to care for Riley's serious medical needs. Further, where McArdle documented her personal knowledge as to how Riley could access & occupy his ordered care, shows that McArdle/HSU were deliberately indifferent towards Riley's serious medical needs in NEVER referring Riley's order to occupy medical footwear to the SMC as they had done with the _____ feed cell, TENS unit, extra pillow (etc.) requests, nor did they (HSU) McArdle refer it to the Warden, where McArdle dismissed Riley's rationalization for her to do so. Instead McArdle told Riley to contact the Warden when if this was appropriate, Riley would have contacted the Warden on May 15, 2016 when the matter gave rise, & bypassed HSU's duties.

117. Yet, on July 17, 2018, as instructed; desperate, Riley sent a request to Warden Boughton, requesting for Boughton to oversee Riley receiving his medical footwear. Riley provided Boughton with documented evidence of his serious medical needs, actual photos of Riley occupying his needed footwear in the SMC, & explained that McArdle/HSU had directed Riley to Boughton to access/occupy his medical footwear. However, Boughton ignored

Riley's plea & supporting evidence when Boughton sent Riley a Memo, informing Riley that he had referred the matter back to the HSU, the Department who had not only been refusing to provide/mediate Riley's care but the Department that referred Riley to Boughton in the first place, & even worse Boughton remanded the matter back to the person who verbalized that Riley had another thing coming, Waterman. Waterman shifted in responding, "All medical recommendations are dependent on approval of DOC Providers", while she previously dismissed Riley in claiming that the DOC (HSU) has nothing to do with issuing medical footwear. However, HSU's very own sole Provider, Miller prescribed; thus, approved for Riley to occupy Athletic Air Sole shoes & sandals, only to have Waterman fabricate those orders in assuring that Riley had another thing coming. Further, McArdle at one point instructed Riley to go ahead & purchase Air Sole footwear until Waterman "disclosed" that Riley had another thing coming with McArdle. Given Waterman's shifting, Riley should have accessed his medical footwear.

118.    Even more disturbing was the fact that Boughton told Riley, "It is a concern to take up with property, not Health Services", while no property officers possess/any medical training, knowledge or skillset to oversee such matters. Boughton made this assertion though he was referring the matter back to HSU. Riley could only shake his head in disbelief of the Warden & HSU's hollow rubber-stamping tactics of deferring & denying Riley accessing his ordered care. In contacting the property officers, Riley was told that the decision for Riley occupying medical footwear

was up to HSU. Though Riley provided Boughton with documentation of a CPOC Provider ordering/approving Riley's accessing medical footwear, showing that Riley should have done so, given Waterman's stuff, once the matter was referred back to HSU; Riley still moved to provide the Security Director with supporting documentation in submitting the request to him, but to no avail.

119. On July 15,2015, Riley executed grievance against the denial of his ordered care. This complaint was recommended to be REJECTED by the Examiner under the false presumption that the matter had previously been addressed while Riley was now grieving against the refusal of UW. Madison's orders, not orders made by Gunderson. Boughton accepted the REJECTION of this complaint. Riley then filed another complaint against Boughton, alleging deliberate indifference in the mishandling of Riley's request to Boughton, but RSA Warden Boerner Unger upheld the recommendation of dismissal of the complaint which Riley then appealed to no avail.

120. On August 16,2015, inmate Jackie Carter (Carter), who was housed on the same unit with Riley, & was aware of Riley's ongoing situation, provided Riley with a declaration. Carter's declaration provided that he along with many other patients/ prisoners of the WRC were occupying a Medical/Special Needs Authorization that allowed them to purchase Athletic style tennis shoes from outside vendors such as Foot Locker, East Bay or the likeness. Carter elaborated on his experience & knowledge of WSPF's habitual deliberate indifference towards its prisoners in refusing them access to their ordered/prescribed medical care,

where injunctions were requested, GRANTED & imposed against WSPF's deliberate indifference.

121. Riley would encounter inmate George Taylor (Taylor) upon being received by Green Bay Correctional Institution (GBCI). Taylor also had Medical Special Needs Authorization to purchase & occupy shoes from an outside vendor in excess of #75. Taylor volunteered to provide Riley with a declaration & a copy of his "Special Handling Summary" that entails: 1) Ice 2 x per day for 20 minutes. 2) Wear personal shoes at all-times. 3) Pt. may order shoes from outside vendor in excess of #75; nearly identical to Smith's orders made for Riley. Taylor was allowed to utilize said restriction at his previous facility, but is now in the Courts, seeking Mediation against GBCI's refusal to allow him to access & utilize his specific care, which is what Riley is being subjected to as well. Taylor's restriction is permanent, viz., until effective until date of release.

122. Riley would be transferred from WSPF to Green Bay Correctional Institution (GBCI) on or around July 2, 2019, where up to point of transfer, Riley was confronted with HSU's/WSPF's continuous refusal to allow Riley adequate/ effective care for his serious medical needs, even after HSU's very own "second opinion" provided that PTA/WSPF do otherwise & allow Riley to access his prescribed medical (footwear) apparatus. & just as Smith warned/placed the defendants on NOTICE (that until Riley gets the proper support, his conditions will continue to get worse), Riley continues to grapple with his exacerbating conditions that are mentally &

emotionally taxing, as they are physically overwhelming & debilitating to the point that they have immobilized & reduced Riley to selectively engaging in out-of-cell activities at OPCI; which is usually medical & property passes that are very brief. Riley even has to be selective about when to mobilize for showers during this the dangerous/very risky pandemic. Riley's once daily (activity) routine has been reduced greatly due his chronic pains; most notably Riley is unable to perform his five obligatory daily prayers as a Muslim.

## ADMINISTRATIVE EXHAUSTION

123. All administrative pre-suit requirements have been exhausted & the claims pled herein are properly before this Court.

## CAUSES OF ACTION

124. Plaintiff Riley's right to seek redress for deprivation of his First, Eighth & Fourteenth Amendment rights is protected by the United States Constitution. The Defendants met this conduct with deliberate indifference, medical neglect & medical malpractice causing significant injury that may be permanent; harassment, humiliation & reprisal as described in the complaint; & violation of Due Process. All actions by the Defendants were entirely unrelated to any legitimate penological interest; thus violating Riley's Constitutional Rights.

125. Defendant Waterman verbalizing her intention to prevent Riley's prescribed medical footwear/apparatus, & then continuously acting on that intention, maliciously & sadistically, as

Waterman acted with the intent to continuously cause Riley injury/harm where Waterman was on NOTICE from the off-site experts; & Riley as well, that Riley had in fact been suffering chronic/severe, debilitating pains, as he continuously grieved to (HSU) for more than two years. (Waterman) (HSU) was also on NOTICE that Riley's conditions had exacerbated to Tendonitis, & that Riley's conditions would in fact continue to worsen if Riley was prevented further from accessing/occupying his prescribed medical supports. Waterman's malicious & sadistic deliberate indifference caused Riley significant injury that Riley has grappled with for four years, & very well may be permanent. Waterman (continuously) knowingly disregarded the significant risk for injury that she was aware that Riley was exposed to as she assured that Riley had another thing coming in place of his Specialist ordered care. Thus, subjecting Riley to cruel & unusual punishment unrelated to any legitimate penological interest, & in violation of Riley's Eighth Amendment Rights enumerated under the United States Constitution. Waterman also targeted Riley with continuous deliberate indifference towards Riley's serious medical needs, in violation of Riley's Equal Protection Rights enumerated under the Fourteenth Amendment to the United States Constitution, as Waterman did not target other inmates & prevent their care while they were situated as Riley was & had sought medical services from HSU as well.

126. Waterman's "discussing" medical matters related to Riley accessing/occupying his care with her HSU staff & then instructing them to not make any orders for care related to

medical footwear (which amounted to insisting that no restrictions for medical be referred to the ONC for review & approval), created a "Top Down" approach that involved several (#'s) personnel to collectively participate in assuring that Riley had another thing coming; unrelated to any legitimate penological interest; subjecting Riley to continuous deliberate indifference that caused Riley significant injury that very well may be permanent, & in violation of Riley's Eighth & Fourteenth Amendment Rights afforded to Riley under the United States Constitution.

127. Where the Keeping of medical records is a necessity, adequate & accurate records are essential & are of critical importance ... in any attempt to provide a continuity of medical care; absent, deficient, fabricated / distorted records create the possibility for disaster. A caterman's purposefu'l fabrication / distortion & destruction of Riley's medical file (orders) a direct violation of Riley's Eighth Amendment Rights afforded to Riley under the United States Constitution, & also in violation of Riley's Equal Protection Rights afforded to Riley by the United States Constitution.

128. Waterman's trying to the complaint examiner in relation to Riley's complaining against Waterman's continuous deliberate indifference, prevented Riley's redress in the matter, in violation of Riley's First Amendment Rights enumerated but the United States Constitution.

129. Waterman's casual, unjustified dissemination of Riley's confidential medical information to non-medical staff

& inmate Head amounted to willful neglect that went unaddressed or corrected; & in violation of privacy laws governing health information. Waterman's actions violated Riley's Fourteenth Amendment Rights to Equal Protection under the law/as enumerated by the United States Constitution. Waterman did not disseminate the confidential medical information of other individual inmates who had been off site for Specialist care & had received orders. Riley cannot be singled out as Waterman had targeted Riley.

130.  Waterman's involvement in the grossly prolonged & unnecessarily delayed/denial of Specialist referrals that Riley was subjected to, was deliberate indifference towards Riley's serious medical needs; & was in violation of Riley's Eighth Amendment Rights afforded by the United States Constitution & also in violation of Riley's Equal Protection Rights afforded by the Fourteenth Amendment to the United States Constitution.

131.  Waterman's involvement in the denial of Riley's TENS unit & any other care described in this complaint, was done maliciously & sadistically with the intent to cause harm/injury to Riley, in violation of Riley's Eighth Amendment Rights afforded by the United States Constitution & in violation of Riley's Rights to Equal Protection afforded by the Fourteenth Amendment to the United States Constitution.

132.  Defendant McArdles continuous Specialist referrals in shopping around for a difference of opinion to under-

more & undo previous Specialist orders set in place for Riley to occupy medical footwear, only to continuously refuse Riley access to the care, amounts to deliberate indifference towards Riley's serious medical needs, as Riley suffered significant injury that may be permanent as a result of McArdle's actions. McArdle's actions were also done with the intent to cause Riley harm/injury as McArdle was not only on NOTICE (of the risk that Riley was exposed to) in being left untreated from the off-site Specialist & Riley, but McArdle in fact documented Riley's exacerbating chronic/severe & debilitating injuries that Riley continuously grieved against.

133. McArdle's persistence in ineffective care as described in this complaint, & in place of the care that McArdle knew to be optimal for Riley's treatment, amounts to medical neglect & deliberate indifference towards Riley's serious medical needs. McArdle, knowing the risk of injury that Riley was exposed to in occupying inadequate & useless care, persisted in such care maliciously & sadistically with the intent to cause an already grieving Riley irreversible harm.

134. McArdle's deliberately indifferent actions of falsifying Riley's medical records as described in this complaint, was in violation of Riley's Eighth Amendment rights afforded to Riley by the United States Constitution.

135. Defendant Boughton's refusal to take the appropriate & necessary action to allow Riley to access/occupy his much needed care, amounted to Boughton

turning a blind-eye countless times to Riley's prolonged suffering & significant risk for suffering irreversible injury, in violation of Riley's Eighth Amendment=Rights enumerated under the United States Constitution.

130. Defendant Miller's sexual assault against Riley was repugnant to the human conscience; that an entrusted medical provider took on sexual predatorial misconduct in using his profession/position for other than its intended purposes as opposed to caring for a suffering Riley, & in violation of Riley's Fourth Amendment Right to be secure within his person; in violation of Riley's Eighth Amendment Right, as Miller was aware that Riley objected to his initial inappropriate comments on Riley's muscular physique; thus, Miller was malicious & sadistic in intending to cause Riley mental & emotional harm in groping Riley without Riley's consent. Miller's sexual assault was also done in violation of Riley's First Amendment Rights to guard his modesty as a Muslim. Miller's sexual assault also violated Riley's Equal Protection Rights afforded by the Fourteenth Amendment; all afforded by the United States Constitution. Miller violated prohibition of sexual contact between prison employee & prisoners (Zero Tolerance Policy Laws).

131. Defendant LaBelle continuously refused to take action in the complaint process to correct obvious violations that the defendants had carried out against Riley's Constitutional Rights. LaBelle continuously turned a blind-eye in dismissing or rejecting every complaint that was handled as such in this complaint. Thus, violating Riley's First Amendment Rights to seek

redress through the ICRS, & also in violation of Riley's Eighth Amendment Rights afforded by the United States Constitution, as LaPorte's actions allowed Riley to suffered significant injury that may be permanent.

138. Defendant Alsum continuously refused to take the necessary action in the complaint process, to correct obvious Constitutional violations made by PSU & WSPF officials. Alsum continuously turned a blind-eye to Riley's suffering, in dismissing or rejecting every complaint that was handled as such. Thus, violating Riley's First Amendment right to seek redress through the ICRS, & also in violation of Riley's Eighth Amendment rights afforded by the United States Constitution, as Alsum's actions allowed Riley to suffer significant injury that may be permanent.

139. Defendant Brown essentially undermined & prevented Riley seeking redress in the matter at the Administrative level as this complaint examiner continuously refuted Riley's complaints with hollow formality in initiating the rubber-stamping assembly line that the ICRS defendants reduced the complaint process to. The examiner continuously met with the defendant perpetrators & relied on their self-serving protective accounts of the Constitutional violations that Riley grieved against, while the examiner turned a blind-eye to Riley's factual exhibited evidence that supported Riley's complaints. & to Riley's suffering/injury(ies) & risks for permanent injuries. Brown's turning a blind-eye violated Riley's First

Amendment Right to seek redress at the Administrative level, as protected by the United States Constitution, & also violated Riley's Eighth Amendment Rights afforded by the United States Constitution. Brown's actions also violated Riley's Due Process Rights afforded by the Fourteenth Amendment to the United States Constitution.

140.     Defendant Payne essentially undermined & prevented Riley's redress at the Administrative level as this complaint examiner continuously refuted Riley's complaints with hollow formality & in initiating the rubber-stamping assembly line that the TCCS defendants reduced the complaint process to. The examiner continuously met with the defendant perpetrators & relied on their self-serving protective accounts of the Constitutional violations that Riley grieved against, while the examiner turned a blind-eye to Riley's factual exhibited evidence that supported Riley's complaints, & to Riley's suffering/injury (ies) & risks for permanent injuries. Payne's turning a blind-eye violated Riley's First Amendment Right to seek redress at the Administrative level, as protected by the United States Constitution, & also in violation of Riley's Eighth Amendment Rights protected under the United States Constitution. Payne's actions also violated Riley's Due Process Rights enumerated under the Fourteenth Act Amendment to the United States Constitution.

141.     Defendant Jaeger declined to take the necessary & appropriate action in turning a blind-eye to Riley's Constitutional deprivations, in violation of

Filey's First Amendment Rights to seek redress at the Administrative level, in violation of Filey's Eighth Amendment Rights & against Filey's Due Process Rights enumerated under the Fourteenth Amendment; all to the United States Constitution.

142. Defendant Broadbent's cover up of defendant Miller's sexual assault against Filey constituted violation of Filey First Amendment Rights to seek redress at the Administrative level; violations of Filey's Eighth Amendment Rights where Filey suffered mental & emotional distress from the assault & subsequent cover up, that amounted to cruel & unusual punishment that Filey was retaliated targeted with & retaliated against as a result of having complained against Constitutional violations. Broadbent's action also violated Filey's Due Process Rights enumerated under the Fourteenth Amendment to the United States Constitution. Broadbent's failure to meaningfully investigate Filey's complaint against Miller's sexual assault also exposed Filey at risk to be victimized by Miller in the future as Miller was a DPFS sole provider, & was directly responsible for Filey's well-being in relation to care that was needed for Filey's serious medical needs.

143. The defendant Special Needs Committee members approved & facilitated each one of Filey's off-site Specialist visits & turned a blind-eye to Filey being shipped around while suffering significant injuries) in an attempt to justify the deliberate indifference; thus, to allow Filey to likely suffer permanent injury. It is evident that

the SNC possessed all relevant/available information (for review) that justified Riley occupy his prescribed footwear at his first or second Specialist visit. Where Waterman is a member of the SNC, it is clear where the Constitutional deprivations/violations initiated from within the Committee. The SNC violated Riley's Eighth Amendment Rights to the United States Constitution as they continuously turned a blind-eye to Riley's suffering in designating Riley offsite on eight occasions while overlooking the Specialist's orders for care for more than two years.

144. All defendants responsible for never referring Riley's Specialist orders to occupy Athletic Air Sole medical footwear, to the Special Needs Committee, did so maliciously & sadistically to cause Riley injury/harm in preventing Riley's much needed care; as there was no medical disagreement with Specialist recommendations. These actions caused Riley significant injury that may be permanent; & violated Riley's Eighth Amendment Rights to the United States Constitution.

145. All defendants responsible for the denial of or for the unnecessary delay of Riley's Specialist visits & any other care, caused Riley injury that may be permanent. These defendants also sat idly in turning a blind-eye to Riley's suffering in being denied care, or having his care delayed in excess, in violation of Riley's Eighth Amendment Rights to the United States Constitution.

146. All defendants responsible for subjecting Riley to the unnecessary prolonged pain that Riley has endured for more than four years due to denial of care or due to the excessive unnecessary denial of care in the past; caused Riley significant harm that may be permanent. These actions violated Riley's Eighth Amendment rights to the United States Constitution.

## JURY TRIAL DEMAND

147. Plaintiff Riley hereby demands a trial by jury in accordance with the Seventh Amendment to the United States Constitution, & Federal Rules of Civil Procedure, Rule 38, et seq..

## RELIEF REQUESTED

148. A Declatory Declaratory Judgement, declaring that the acts & omissions described within this complaint have violated Plaintiff Riley's rights under the Constitution & laws of the United States.

149. Award compensatory damages in the following amounts:

a) $750,000.00 from defendant Waterman, for each cause of action, separately in both her individual & official capacities;

b) $750,000.00 from defendant NP, McArdle, for each cause of action, separately in both her individual & official capacities;

c) $100,000.00 from defendant Boughton, for each cause of action, separately in both his individual & official capacities;

d) $500,000.00 from defendant Dr. Miller, for each cause of action, separately in both his individual & official capacities;

e) $100,000.00 from defendant LaBelle, for each cause of action, separately in both her individual & official capacities;

f) $100,000.00 from defendant Alsum, for each cause of action, separately in both her individual & official capacities;

g) $100,000.00 from defendant Brown, for each cause of action, separately in both his individual & official capacities;

h) $100,000.00 from defendant Payne, for each cause of action, separately in both his/her individual & official capacities;

i) $50,000.00 from defendant Jaeger, for each cause of action, separately in his/her individual & official capacities;

j) $250,000.00 from defendant Bradbent, for each cause of action, separately in his individual & official capacities;

k) $300,000.00 from defendant Special Needs Committee, for each cause of action, separately in its individual & official capacities;

150. Award punitive damages in the following amounts:

a) *250,000.00 from defendant Waterman, for each cause of action, separately in both his individual & official capacities;

b) *200,000.00 from defendant NEAdle, for each cause of action, separately in both his individual & official capacities.

c) *25,000.00 from defendant Boughton, for each cause of action, separately in both his individual & official capacities;

d) *200,000.00 from defendant Miller, for each cause of action, separately in both his individual & official capacities;

e) *50,000.00 from defendant LaBelle, for each cause of action, separately in both his individual & official capacities;

f) *50,000.00 from defendant Album, for each cause of action, separately in both her individual & official capacities;

g) *25,000.00 from defendant Brown, for each cause of action, separately in both his individual & official capacities;

h) *25,000.00 from defendant Payne, for each cause of action, separately in both his/her individual & official capacities;

i) *25,000.00 from defendant Jaeger, for each cause of action, separately in both his/her individual & official capacities;

j) *75,000.00 from defendant Broadbent, for each cause of action separately in both his individual & official capacities;

k) *100,000.00 from defendant Special Needs Committee,

for each cause of action, separately in both its individual & official capacities.

151. Issue & grant any & all further relief which this Honorable Court deems, just, proper, & equitable.

## VERIFICATION

I have read the foregoing Complaint & hereby verify that the matters alleged herein are true & correct, except as to matters alleged upon information & belief, &, as to these, I believe them to be true. I further & hereby certify under penalty of perjury that the foregoing is true & correct.

Respectfully executed this 12th day of August, 2020.

Pro se, /s/ _____
Shawn Riley - (263944)
Green Bay Correctional Inst.
Post Office Box 19033
Green Bay, WI 54307