UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHAWN RILEY,

                Plaintiff,

     v.                           Case No. 20-cv-1252-pp

JOLINDA WATERMAN,
and SANDRA MCARDLE,

                Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR RECRUITMENT OF COUNSEL (DKT. NO. 33), DENYING PLAINTIFF'S MOTION TO AMEND BRIEF (DKT. NO. 58), GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 34, 39) AND DISMISSING CASE**

        Shawn Riley, who is incarcerated at Stanley Correctional Institution and is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against a registered nurse and the Health Services Manager at the Wisconsin Secure Program Facility (WSPF). The defendants each have moved for summary judgment. Dkt. Nos. 34, 39. The plaintiff opposes the motions. Dkt. Nos. 45, 49. He also has asked the court to appoint an attorney to represent him, dkt. no. 33, and has asked to amend his brief in opposition to the defendants' motion, dkt. no. 58. The court finds that the defendants are entitled to judgment as a matter of law. The court will grant the defendants' motions, deny the plaintiff's motions and dismiss the case.

Case 2:20-cv-01252-PP   Filed 08/16/22   Page 1 of 54   Document 64

## I.    Facts

### A.    Procedural Background

On August 14, 2020, the plaintiff filed an eighty-seven-page complaint that named eleven defendants and contained over 145 paragraphs of allegations and legal assertions. Dkt. No. 1. The court screened the complaint and dismissed it for violating Federal Rules of Civil Procedure 8, 18 and 20 because of its excessive length, unnecessarily wordy nature and attempt to bring unrelated claims against different groups of defendants. Dkt. No. 10 at 4–6. The court ordered the plaintiff to file an amended complaint that contained "a 'simple, concise, and direct' statement of his claims." Id. at 6 (quoting Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998)). The court also denied without prejudice the plaintiff's motion to appoint him a lawyer because he did not demonstrate that he needed an attorney to present his claims adequately and litigate the case. Id. at 10–11. The court noted that although the complaint was excessively wordy, the plaintiff had clearly communicated his claims. Id. at 12.

On December 9, 2020, the plaintiff filed an amended complaint naming as defendants Health Services Manager Jolinda Waterman and Registered Nurse Sandra McArdle, both of whom worked at WSPF at the time of the alleged events. Dkt. No. 12. The court screened the amended complaint and allowed the plaintiff to proceed on an Eighth Amendment claim that Waterman and McArdle failed to provide adequate medical treatment for the plaintiff's

duck-footedness, which caused him chronic and severe pain for over four years. Id. at 6–7.

After the defendants had answered the amended complaint, dkt. nos. 18, 24, the court entered a scheduling order setting deadlines of October 22, 2021 for the parties to complete discovery and November 22, 2021 for the parties to file dispositive motions on the merits of the plaintiff's claims. Dkt. No. 27. On November 16, 2021—about a week before the deadline for filing summary judgment motions—the plaintiff filed a second motion asking the court to appoint him a lawyer. Dkt. No. 33. On the November 22, 2021 deadline, the defendants each filed their own motions for summary judgment. Dkt. Nos. 34, 39. The plaintiff timely filed responses to both motions and filed proposed facts and declarations in support of his opposition. Dkt. Nos. 45–52. Defendant Waterman requested an extension of time to file her reply brief, dkt. no. 53, which the court granted, dkt. no. 54. After defendant McArdle filed her reply brief, dkt. no. 55, but before Waterman filed hers, the plaintiff moved to amend his brief "in support for opposition to summary judgment," dkt. no. 58. McArdle opposes this motion. Dkt. No. 62. Waterman did not respond to it, and the time to do so has passed. See Civil Local Rule 7(b) (E.D. Wis.).

B.    Factual Background

At the time of the events described in the amended complaint, the plaintiff was incarcerated at WSPF. Dkt. No. 36 at ¶1. Waterman was the Health Services Manager at WSPF from January 2015 until her retirement in

May 2019. Id. at ¶2. McArdle was a Nurse Practitioner licensed to practice medicine in Wisconsin. Dkt. No. 41 at ¶1.

        1.    *The Amended Complaint*

The amended complaint alleges that all his life, the plaintiff has suffered from duck-footedness, which he describes as "having an eversion of the foot, causing malalignment of [his] leg joints (ankles & knees); thus, pain); & for debilitating muscle cramps." Dkt. No. 12 at 3. It alleges that the plaintiff wore corrective leg braces as a child but now wears medical footwear, including athletic air sole shoes or sandals. Id. It alleges that in May 2016, the plaintiff sought services from the Health Services Unit for pain and complications from the duck-footedness, but that the prison's medical staff was unable to diagnose or treat him. Id. McArdle sent him to an offsite specialist for treatment, and on March 24, 2017, a specialist diagnosed the plaintiff with "'Tight Heel Cord, Plantar Fasciitis & Collapsed Medial Arches' in both feet." Id. The specialist ordered the plaintiff to wear athletic, high-top shoes with soft inserts pending a follow-up appointment. Id.

The plaintiff alleges that he later learned "about Waterman verbalizing her intention to prevent [him] from accessing medical shoes." Id. at 3-4. He asserts that without care, his condition worsened. Id. at 4. The plaintiff says he had six offsite visits with specialists, all of which resulted in the same diagnosis and order for care, but that he never received the care ordered by the specialists because McArdle and Waterman erased the specialists' orders and failed to refer his needs to the Special Needs Committee for review. Id. He

asserts that he "regularly" told the Health Services Unit about his worsening conditions and how they kept him from exercising, doing his daily prayers as a Muslim and even sitting, standing or walking without pain. Id. On July 11, 2018, the plaintiff received a second opinion from a podiatrist at the University of Wisconsin. Id. She diagnosed the plaintiff with "Achilles Tendonitis, Bilateral Posterior Tendonitis, [and] Plantar Fasciitis Bilateral." Id. The podiatrist allegedly noted, "This is about proper support & until [the plaintiff] gets the right shoes & inserts, this pain will not go away & will continue to get worse." Id. The plaintiff says that the podiatrist ordered him to wear "personal shoes" all the time, including on his offsite medical visits, and that he "access/occupy medical footwear from venders separate from general consumption, beyond $75 as optimum care." Id. The plaintiff alleges that McArdle crossed out the podiatrist's orders on his medical file, leaving him to suffer. Id. at 3–4.

The plaintiff says that in July 2019, he was transferred to another prison, where he continued to suffer; he says, however, that in October 2020, the new prison's Health Services Unit eventually approved his medical restriction and allowed him to purchase athletic air sole shoes from an outside vendor for more than $75. Id. at 4. He says those shoes allowed him "to beg[i]n effectively treating his chronic/severe pains." Id. at 5.

The plaintiff asserts that McArdle and Waterman knew of his continuous suffering for over four years, that they prevented his obtaining care and that they did so maliciously and sadistically. Id.

*Special Needs Requests and the Special Needs Committee*

WSPF limits property that an incarcerated person may possess, including the quantity and types of shoes. Dkt. No. 36 at ¶3. WSPF issues all incarcerated person one pair of state-issued shoes. Id. at ¶4. There are three exceptions to the requirement that incarcerated persons wear state-issued shoes: 1) the Health Services Unit (HSU) issues an incarcerated person black Velcro medical shoes; 2) an incarcerated person orders personal shoes from an approved vendor catalog; or 3) the prison approves medically necessary shoes that an incarcerated person orders from outside the approved vendor catalogs. Id. at ¶5. McArdle explains that the black Velcro medical shoes "are not athletic style shoes. These are nearly always monochromatic, Velcro shoes which are necessary to accommodate a medical need." Dkt. No. 42 at ¶21. She could not "recall a single instance in which [the HSU] provided athletic style shoes to an inmate." Id. at ¶25.

Under Wisconsin's Division of Adult Institutions Policy #300.20.03, incarcerated persons may order no more than two pair of personal shoes per calendar year from approved vendors. Dkt. No. 36 at ¶23; Dkt. No. 38-3 at 17. In 2017, the maximum allowed cost of personal shoes was $75 per pair. Dkt. No. 36 at ¶24; Dkt. No. 38-3 at 7. Shoes available through the vendor catalogs included a variety of styles, sizes and name brands such as Nike, Reebok and New Balance. Dkt. No. 36 at ¶25; Dkt. No. 38-4 (catalog of approved shoes). McArdle avers that the $75 price limit is implemented for security reasons "and perhaps other reasons." Dkt. No. 42 at ¶11. She explains that shoes are one of

the only items unique to each inmate; in her experience, they often are traded or used as contraband. Id. at ¶12. She avers that for these reasons, the pricing regulations for shoes are "seen as a security concern, not a medical issue." Id. at ¶13. For that reason, medical providers defer to security staff to set monetary limits on shoes inmates are allowed to purchase. Id. at ¶14.

McArdle avers that there are shoes available for purchase in the approved catalogs that "are proper and effective footwear for inmates with Plantar Fasciitis, inmates needing additional arch support, or inmates generally with painful or sore feet." Id. at ¶18. The plaintiff asserts that his continual foot pain and medical issues disprove McArdle's assertion and show that the approved vendor catalogs did not provide shoes that adequately treated inmates with foot issues (particularly, he asserts that the pre-approved vendor shoes lacked either ankle, heel or arch support). Dkt. No. 47 at page 6, ¶15. In support, he cites excerpts of his medical records from offsite visits with podiatrists. Id. (citing Dkt. No. 46-1 at 2, 5, 8–10).

If WSPF prohibits other medically necessary personal property, an incarcerated person may submit a request for that property to the Special Needs Committee. Dkt. No. 36 at ¶6. Under Bureau of Health Services Policy and Procedure #300.07, the Committee addresses requests for special needs and restrictions, including shoes an incarcerated person believes are medically necessary. Id. at ¶¶7–8; Dkt. No. 38-5. Policy #300.07 provides that advanced care providers refer items to the Committee for review rather than writing orders for the requested items. Dkt. No. 36 at ¶9; Dkt. No. 38-5 at ¶I.B. The

Committee must consider several factors when authorizing special needs or restrictions, including the security level and physical environment of the facility. Dkt. No. 36 at ¶10; Dkt. No. 38-5 at ¶I.E. The Committee must consider alternatives to the requested need or restriction. Dkt. No. 38-5 at ¶I.E.

The Committee's purpose is to determine whether an incarcerated person's request for a medical restriction or need is medically necessary. Dkt. No. 36 at ¶11. The Committee is made up of HSU staff and security staff that the Warden selects. Id. at ¶12. The Committee's HSU member reviews the requesting person's medical records to determine if the requested item or action is medically necessary, as explained in Appendix 1 of Policy #300.07. Id. at ¶13; Dkt. No. 38-5 at 6. The Committee must consider all relevant factors and determine whether to approve the requested need or restriction. Dkt. No. 36 at ¶14. The Committee may approve items that it determines "have been scientifically shown to provide solid medical benefit, and to treat significant medical conditions." Dkt. No. 38-5 at ¶I.I; Dkt. No. 36 at ¶16. The Committee must deny a request if the item requested is deemed a comfort item, that is, if it is not medically necessary. Dkt. No. 36 at ¶15; Dkt. No. 38-5 at ¶I.I.

Waterman avers that although she often served on the Committee at WSPF, she does not recall if she served on the Committee that reviewed the plaintiff's requests. Dkt. No. 37 at ¶60. McArdle avers that she never served on the Committee. Dkt. No. 41 at ¶19.

Policy #300.07 addresses requests for additional shoes in Appendix 1. Dkt. No. 36 at ¶17; Dkt. No. 38-5 at 8. That section states as follows:

- BHS/HSU provides customized special medical orthopedic shoes (ones that require special customization and fabrication that are made from a mold or plastic cast specifically for the individual at an orthotic company). Customized orthopedic shoes shall be replaced as determined necessary when showing signs of heavy wear, or no longer cover the foot. Class 3 authorization is required for all medical orthopedic shoes obtained from an orthotic company.

- HSU does not issue, purchase, or authorize special purchases if the inmate is able to wear regular shoes (common shoes that can be purchased from a store or catalog). Inmates should be encouraged to purchase their own personal shoes. If a patient is not able to wear the State supplied footwear due to a significant medical condition (i.e. diabetic with foot ulcers or need for Velcro shoes due to a CVA for independent ADL) and provision of an alternative off the shelf shoe is necessary, the facility shall provide an alternative. These cases are to be very limited and determined on a case by case basis through the established committee/nurse review.

- HSU will not get involved with ordering extra pairs of personal shoes. Property guidelines shall be followed.

- Tennis shoes shall not be ordered by the HSU. Inmates/youths can order tennis shoes according to the property rules. Facility accommodations and exceptions can be made at the facility level and not through HSU if special situations arise (intake facilities).

Dkt. No. 38-5 at 8; Dkt. No. 36 at ¶17.

3. *Inmate Medical Treatment and Waterman's Role as Health Services Manager*

Incarcerated persons may request non-urgent medical attention by submitting a Health Services Request (HSR). Dkt. No. 36 at ¶34. Nursing staff collect and triage HSRs daily. Id. at ¶35. HSU nursing staff and advanced care providers (doctors, nurse practitioners or prescribers, physician assistants) then provide appropriate medical care. Id. at ¶28. Advanced care providers make treatment decisions and care plans for inmates, evaluate treatment

recommendations from offsite providers and, when appropriate, approve recommendations. Id. at ¶¶30–31. McArdle, as a nurse practitioner, was an advanced care provider who evaluated incarcerated persons, made referrals for outside treatment and prescribed medication and treatment options. Dkt. No. 41 at ¶4.

After an incarcerated person consults with an offsite provider, an advanced care provider reviews any treatment recommendations and writes an order if they agree with the recommendations. Dkt. No. 36 at ¶33. McArdle emphasizes that offsite recommendations are just that—recommendations—and that providers must determine whether to accept or reject a specialist's recommendations. Dkt. No. 41 at ¶5. McArdle notes that offsite providers sometimes make recommendations that cannot be implemented in a Department of Corrections facility because doing so would violate security protocol or a prison rule or regulation. Id. at ¶6.

As Health Services Manager, Waterman managed the health care services provided to incarcerated persons and provided overall administrative support and direction of the HSU. Dkt. No. 36 at ¶26. Waterman was not responsible for evaluating, diagnosing or treating inmates and or for prescribing medication. Id. at ¶27. Waterman deferred to advanced care providers' medical decisions and did not have the authority to override or alter their medical decisions except in extraordinary circumstances. Id. at ¶32. Waterman was not responsible for referring incarcerated persons to, or approving treatment recommendations from, offsite providers. Id. at ¶29. She also was not

responsible for triaging HSRs. Id. at ¶36. Incarcerated persons often directed HSRs to Waterman, but that did not impact the standard process for triaging HSRs and did not necessarily mean she would see the HSR. Id. at ¶39. Waterman did not review or respond to HSRs unless nursing staff forwarded an HSR to her for a response. Id. at ¶37. In instances where she did review and respond to an HSR, Waterman would sign her name on the response. Id. at ¶38.

McArdle avers, and the plaintiff does not dispute, that the HSU typically is not involved in providing shoes to incarcerated persons. Dkt. No. 42 at ¶¶20, 22. See Dkt. No. 45 at 7 (the plaintiff's opposition brief, indicating that the HSU at WSPF typically was not involved in providing shoes). McArdle says the HSU may become involved if an inmate has an unusual shoe size or requires a recognized accommodation. Dkt. No. 42 at ¶¶21, 22.

### 4. The Plaintiff's Medical Care[1]

On July 27, 2016, a non-defendant care provider recommended that the plaintiff begin taking ibuprofen to alleviate pain he experienced in his leg and

---

[1] Several of the plaintiff's proposed facts and responses to the defendants' proposed facts cite exhibits that the court was unable to locate in the plaintiff's materials, which are disorganized and inconsistently labeled. The court's local rules require the parties to support any proposed fact or factual dispute with "references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." Civil L.R 56(b)(2)(B)(i)–(ii). The court is "not required to wade through improper denials and legal argument in search of a genuinely disputed fact." See Curtis v. Costco Wholesale Corp., 807 F.3d 215, 219 (7th Cir. 2015) (quotation omitted). The court will not consider proposed facts or disputes that the plaintiff did not support with clear and easily located evidence. See id. ("A litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court.").

foot. Dkt. No. 41 at ¶20; Dkt. No. 42-1 at 36. The provider also ordered knee braces for the plaintiff and explained stretches he could do. Id. The next month, the plaintiff submitted an HSR explaining that he had started playing basketball, which had resulted in soreness. Id. at ¶21. In January 2017, McArdle ordered bilateral x-rays of the plaintiff's foot in response to his complaints about his feet. Id. at ¶22. She provided him ankle braces and referred him for evaluations with a physical therapist and a podiatrist. Id. Later that month, a different provider ordered a TheraBand for the plaintiff to assist him with a self-exercise program. Id. at ¶24.

On March 7, 2017, the plaintiff submitted an HSR confirming that he had received "the gel [and] the new knee splints" but complaining that he had not received shoe inserts. Id. at ¶25; Dkt. No. 42-1 at 19. The plaintiff noted that the gel "hasn't changed the level of my pains" and described the inserts as "much needed medical care." Dkt. No. 42-1 at 19. McArdle responded to the plaintiff's request, saying that the HSW would let him know when the inserts—which she had ordered for the plaintiff on February 20, 2017—had arrived. Dkt. No. 41 at ¶26; Dkt. No. 42-1 at 19.

Between March 24, 2017 and July 11, 2018, the plaintiff consulted with outside specialists six times about his foot condition. Dkt. No. 36 at ¶55 (citing Dkt. No. 38-2 at 42–63). HSU staff included those specialists' recommendations in the plaintiff's medical file, and advanced care providers entered orders in response to the recommendations. Id. at ¶56; Dkt. No. 38-2 at 24–27, 31, 33. The plaintiff's first consultation occurred on March 24, 2017 with Dr. Michael

Jacobs, a podiatrist at Gundersen Lutheran Hospital. Dkt. No. 41 at ¶27; Dkt. No. 42-1 at 34, 43. Dr. Jacobs diagnosed the plaintiff with plantar fasciitis in both feet, "Ankle equinus secondary to tight heel cord" and "Pes planovalgus." Dkt. No. 42-1 at 43. He said that he would recommend support, would dispense soft white inserts (which it appears the plaintiff had received by then) and would follow up in the future. Id. at 34, 43. Jacobs also said he discussed with the plaintiff the possible future need for prescription orthotics if these measures did not work. Id. at 43.

Dr. Jacobs also recommended that the plaintiff wear high-top athletic-type shoes. Id. The prescriber's order associated with this visit notes Dr. Jacobs's recommendation for "high top athletic shoe for ankle," but an additional note on the file advises that the plaintiff would have "to purchase own [shoes] per policy." Id. at 34. McArdle explained elsewhere in the plaintiff's medical file that the HSU does not provide "high top shoes" because they are not considered medical items. Dkt. No. 41 at ¶28; Dkt. No. 42-1 at 31. McArdle notes that Dr. Jacobs recommended the shoes for "rear foot stability," but that she ordered the ankle braces for the same purpose. Dkt. No. 42 at ¶34. McArdle deferred to Waterman about a decision on the high-top shoes. Dkt. No. 41 at ¶30; Dkt. No. 42-1 at 31. She avers that she implemented Dr. Jacobs's recommendations to the extent possible. Dkt. No. 41 at ¶31; Dkt. No. 42 at ¶36. McArdle also notes that the plaintiff could have purchased high-top athletic shoes from an approved catalog or outside vendor. Dkt. No. 41 at ¶32; Dkt. No. 42 at ¶37. The plaintiff insists that McArdle "dismissed Dr. Jacobs'

recommendation" of high-top shoes. Dkt. No. 47 at ¶31. He says high-top shoes were not available from the approved vendors but does not dispute that he could have purchased them from an outside vendor. Id. at ¶32.

On March 24, 2017, after his appointment with Dr. Jacobs, the plaintiff filed an HSR insisting that Dr. Jacobs' recommendation for inserts "alone will not accommodate [him] w/the ankle support that [he] must have." Dkt. No. 42-1 at 18. He insisted that he could not "wait in pain while suffering during a trial period w/the inserts." Id. He asked that the HSU "go on [and] order the ankle braces [and] a back brace as soon as possible." Id. A nurse responded the next day that the plaintiff had been placed on the provider list for an evaluation. Id. On March 29, 2017, McArdle advised the plaintiff to wear the ankle braces, which the HSU had provided to him, when he was up and moving around. Dkt. No. 41 at ¶35; Dkt. No. 42-1 at 34. She ordered x-rays for the plaintiff's lumbar spine, hip and right knee to address his complaints of pain in those areas. Dkt. No. 41 at ¶36; Dkt. No. 42-1 at 34.

On April 11, 2017, the plaintiff wrote an HSR to the HSU manager indicating that he needed the athletic, high-top shoes recommended by Dr. Jacobs. Dkt. No. 41 at ¶37; Dkt. No. 42-1 at 20. He stated that his family was unable to "find adequate 'high top athletic' style shoes for $75." Dkt. No. 42-1 at 20. A nurse, not Waterman, responded the next day that the plaintiff "[would] need to adhere to policy." Id. McArdle avers that there were high-top shoes available in the pre-approved catalogs that met the $75 price range. Dkt. No. 41 at ¶39 (citing Dkt. No. 42 at ¶¶17–18). The plaintiff does not dispute

that there were and are shoes he could have purchased for $75 or less, but he disputes that those shoes were available through pre-approved vendors or that they were adequate. Dkt. No. 47 at ¶40.[2]

On April 25, 2017, McArdle referred the plaintiff for an appointment with Gundersen Lutheran Hospital in La Crosse to obtain custom orthotics. Dkt. No. 41 at ¶41. She instructed him to avoid basketball and running and to instead use the exercise bike three times per week. Id.; Dkt. No. 42-1 at 30, 33. On May 5, 2017, the plaintiff again saw Dr. Jacobs, who recommended the plaintiff receive prescription orthotics. Dkt. No. 41 at ¶42. He encouraged the plaintiff to continue his stretching exercises and recommended physical therapy for his lower back pain. Id.; Dkt. No. 42-1 at 42. Dr. Jacobs also recommended "if possible athletic type shoe, high-top in nature," which he explained "will help control mid foot to ankle motion and help promote a more neutral gait with less symptoms." Dkt. No. 42-1 at 42. He recommended that if the plaintiff had difficulty with his orthotic after "1 month of use," he should contact "DOC Boscobel Health Center." Id. Later that day, McArdle wrote the plaintiff a referral for physical therapy. Id. at 40. The physical therapist noted that the plaintiff demonstrated "occasional compliance" with past physical therapy

---

[2] The plaintiff asserts that on April 12, 2017, he consulted with McArdle about the high-top shoes and asked her "to refer a Special Needs Request to the Special Needs Committee (SNC) so that he could access his specialist-recommended shoes from an outside vender." Dkt. No. 48 at ¶12. The only exhibit he cites in support (HSU 947) is not in the record. As noted, the court will not consider proposed facts or factual disputes unless there is supporting evidence in the record. Supra, fn.1.

recommendations. Id. at 41. The therapist did not recommend further sessions based on the "lack of success" with previous sessions. Id.; Dkt. No. 41 at ¶44.

On May 24, 2017, the plaintiff received his custom orthotics. Dkt. No. 41 at ¶45; Dkt. No. 42-1 at 21. The next day, he filed an HSR directed to McArdle complaining that the orthotics did not "mitigate, address nor correct [his] feet" and that the foam padding of the orthotics "simply tore off." Dkt. No. 41 at ¶46; Dkt. No. 42-1 at 21. McArdle avers that the plaintiff should have given the orthotics time to address his foot issues, including his chronic plantar fasciitis. Dkt. No. 42 at ¶49. She explained to the plaintiff that the orthotics would help the positioning and posture of his feet over time and provide cushion for support and to alleviate pain. Id. Nonetheless, on June 5, 2017, the plaintiff filed another HSR complaining about the orthotics, to which McArdle responded and advised the plaintiff to "give the custom inserts at least a month," as Dr. Jacobs had advised. Dkt. No. 42-1 at 22–23, 42.

On June 20, 2017, the plaintiff sent another HSR to McArdle explaining that high-top shoes he had ordered from a catalog were "actually mid" top shoes and that the shoes plus orthotics were not relieving his foot pain. Dkt. No. 41 at ¶51; Dkt. No. 42-1 at 24. He requested a follow-up appointment, which McArdle said she scheduled with a podiatrist. Dkt. No. 41 at ¶52; Dkt. No. 42-1 at 24. On August 13, 2017, the plaintiff sent a six-page HSR complaining that he had not yet had a podiatry appointment and claiming, among other things, that his foot pain continued to torture him. Dkt. No. 41 at ¶¶53–54; Dkt. No. 42-1 at 9–14. Waterman responded to the plaintiff and

explained that he had an August 15, 2017 appointment with a podiatrist, that the HSU had ordered lower leg splints and the "HSU has NOTHING to do with personal shoes." Dkt. No. 41 at ¶55; Dkt. No. 42-1 at 9–14 (specific quote at 11). Waterman reminded the plaintiff he had a prescription for extra-strength pain medication to use until his appointment. Dkt. No. 41 at ¶56; Dkt. No. 42-1 at 12.

On September 26, 2017, the plaintiff directed an HSR to "Dr. Miller," whom he saw on August 15, 2017. Dkt. No. 42-1 at 17. He wrote that Dr. Miller "ordered medical restrictions/accommodations for Air Bubbled Athletic tennis shoes, Air Bubbled (or otherwise) Athletic sandals, personal socks [and] an herbal pain remedy." Id. The plaintiff complained that only the shoe recommendation had appeared in his medical file, and he asked Dr. Miller to "correct/complete the record." Id. Waterman responded to the plaintiff's request and noted she had spoken with Dr. Miller and reviewed the plaintiff's medical file. Id. Waterman told the plaintiff he "purely circumvented the shoe policy" and reminded him that the "HSU does not purchase athletic shoes." Id. She advised the plaintiff to purchase "shower sandals and socks through canteen." Id. McArdle speculates that the plaintiff told Dr. Miller, who is not a state employee or medical provider, that he needed the "air bubbled shoes," so Dr. Miller wrote the order for them. Dkt. No. 42 at ¶57. McArdle avers that she is unaware of any medical need for "air bubbled shoes" that properly supported and cushioned shoes would not also address. Id. She reiterates that adequate shoes were available for purchase through the preapproved vendors. Id.

On October 30, 2017, the plaintiff submitted another HSR stating that he had not received treatment for "chronic pain in [his] feet, legs, back [and] neck." Dkt. No. 41 at ¶64; Dkt. No. 42-1 at 15. McArdle responded the next day and explained that the HSU had tended to the plaintiff's complaints including performing "an EMG (nerve conduction test)" on his left leg, "which was negative." Dkt. No. 42-1 at 15. McArdle explains that a negative EMG means there are no signs of neuropathy. Dkt. No. 42 at ¶58. She recommended that the plaintiff take his medications (of which he had not requested a refill) and referred him for physical therapy. Dkt. No. 41 at ¶66; Dkt. No. 42-1 at 15. The plaintiff insists he did not refill his pain medications "because it was more harmful than helpful . . . the pills were useless." Dkt. No. 47 at ¶66. He insists this demonstrates that McArdle "persist[ed] in ineffective care." Id.

On November 17, 2017, the plaintiff had a third appointment with Dr. Jacobs. Dkt. No. 41 at ¶67. Dr. Jacobs confirmed that the plaintiff had received the custom orthotics and noted the plaintiff's complaint that the orthotic "does not function well" with the high-top athletic shoe or the state-issued shoes. Dkt. No. 42-1 at 38. He observed that the plaintiff had requested "a different form of shoe if possible to function with orthotics that has adequate shock absorption throughout the full length of the shoe." Id. Dr. Jacobs reviewed the plaintiff's "shoe gear that [he] has utilized in the past," including a picture the plaintiff provided of shoes that worked for him before. Id. Dr. Jacobs recommended "shoe gear that will allow adequate depth to accommodate the orthotic," which he described as "the key to protecting this

18

patient's foot as it relates to the plantar fascia." Id. Dr. Jacobs opined that "a shock absorption shoe with air-type shock absorption, full length" would be "optimum" if it could be obtained and "[i]f that is possible within the DOC system." Id. Dr. Jacobs stated that he "made clear to patient that this type of shoe may not be permissable [*sic*] and [he] will need to accept a shoe that is similar." Id.

On December 14, 2017, the plaintiff wrote an HSR to McArdle asking how long he would have to wait to consult with a specialist again. Dkt. No. 41 at ¶73; Dkt. No. 42-1 at 5. The plaintiff asked why McArdle was following every one of the specialist's recommendations for care "except for my medical shoes[.]" Dkt. No. 41 at ¶74; Dkt. No. 42-1 at 5. McArdle responded the next day and again advised the plaintiff that the HSU did not provide personal or athletic shoes. Dkt. No. 41 at ¶74; Dkt. No. 42-1 at 5. She advised him to "order the recommended shoes" through the catalog. Dkt. No. 42-1 at 5. She also advised him that podiatry was best positioned to answer his specific questions about his feet and that the usual time for appointments was six to twelve weeks. Id.

On January 22, 2018, McArdle put a progress note in the plaintiff's medical file noting his continued insistence "that he be allowed to wear the type of shoes that he wore prior to D.O.C." Id. at 28. She noted his complaint that "there are no shoes available in the catalog that can provide him with the proper support or room for his orthotics." Id. McArdle ordered a follow-up with a podiatrist "for evaluation of his need for APEX shoes." Id.; Dkt. No. 46-1 at

102 (prescriber's order for a follow-up appointment with podiatry, APEX shoes and referral to orthopedics). McArdle explains that these are not athletic shoes but are "less desirable" medical shoes "that would be better suited to accept his custom orthotics."[3] Dkt. No. 42 at ¶72. The same day (January 22, 2018), Waterman signed off on McArdle's orders for the follow-up appointment, APEX shoes and referral to orthopedics to address the plaintiff's ongoing knee pain. Dkt. No. 46-1 at 102.[4]

On April 20, 2018, the plaintiff had a fourth appointment with Dr. Jacobs, during which he expressed concern about his "inability to obtain desired shoe gear." Dkt. No. 41 at ¶75; Dkt. No. 42-1 at 37. Dr. Jacobs noted that the plaintiff had received his current shoes "through the current DOC vendor" but was "requesting purchase of air-filled athletic shoe gear outside of DOC vendor." Dkt. No. 42-1 at 37. Dr. Jacobs again recommended air-filled athletic shoes and sandals. Id. He recommended that the plaintiff be allowed to "purchase and utilize vendor outside of current DOC provision if possible" and noted that "above 75 dollars patient would be responsible." Id. Importantly, Dr. Jacobs noted, "these are simply recommendations. Patient understands any access to this type of shoe gear and sandal is the purview of DOC." Id.

---

[3] Https://www.apexfoot.com. APEX describes itself as a "therapeutic footwear" company.

[4] The plaintiff insists that McArdle falsified his medical records, but he does not explain what about the records is fraudulent. Dkt. No. 48 at ¶34. Waterman noted that she reviewed and/or approved these orders by initialing each order in the right-hand column. Dkt. No. 37 at ¶29; Dkt. No. 46-1 at 102. The plaintiff does not explain how McArdle's orders or Waterman's initialing constitutes a falsification of his records.

On May 9, 2018, McArdle again explained to the plaintiff that he could "purchase any athletic shoes available through the catalog." Dkt. No. 42-1 at 27. She explained that "many of the shoes available would address plantar fasciitis." Id. On May 15, 2018, McArdle noted that the plaintiff was "unhappy because he wants to purchase air cushioned shoes to address the pain in his ankles and feet, and these are not available through the catalog." Dkt. No. 51-1 at 79. McArdle noted that she had explained to the plaintiff "that the personal shoes that he may purchase are available through the catalog only." Id. She also noted that the previous offsite provider had not recommended that the plaintiff receive custom orthotic inserts or shoes. Id.; Dkt. No. 42-1 at 27. Given the plaintiff's dissatisfaction, McArdle requested an offsite appointment with the University of Wisconsin's Podiatry clinic to provide a second opinion for treatment of his ankle and foot pain. Dkt. No. 51-1 at 79.

On June 13, 2018, the plaintiff filed an HSR to McArdle complaining that the HSU was "refusing the ordered care" that his specialists recommended. Dkt. No. 41 at ¶81; Dkt. No. 42-1 at 6. He acknowledged receiving "Naproxen, cream, braces, wraps" and a TENS unit but stated those treatments "are all of no use in this instance." Dkt. No. 41 at ¶81; Dkt. No. 42-1 at 6. McArdle responded the next day and advised the plaintiff that "Recommendations from specialists are just that[:] recommendations." Dkt. No. 41 at ¶82; Dkt. No. 42-1 at 6. She reminded the plaintiff that the Department of Corrections has a shoe policy that applies to all incarcerated persons. Dkt. No. 41 at ¶82; Dkt. No. 42-1 at 6. She recommended that the plaintiff perform the strengthening exercises

prescribed and use ice as needed. Dkt. No. 41 at ¶82; Dkt. No. 42-1 at 6. Other

HSU staff informed the plaintiff that McArdle had requested a second opinion

for him, and it was in process. Dkt. No. 41 at ¶83; Dkt. No. 42-1 at 7–8.

McArdle reminded the plaintiff that specialist recommendations could be

implemented only if they followed prison policy. Dkt. No. 42-1 at 8.

On July 11, 2018, the plaintiff had an offsite consultation with Dr. Audra

Smith, a podiatrist at the University of Wisconsin Hospital and Clinics. Dkt.

No. 38-2 at 43–45. Dr. Smith observed that the plaintiff "needs stability

athletic-style shoes that can accommodate his orthotics." Id. at ¶58; Dkt. No.

38-2 at 45. Dr. Smith told the plaintiff she "[could not] really recommend a

specific type of shoe." Dkt. No. 38-2 at 45. She noted, "There are a lot of shoes

out there, not just the bubble shoes, that work for orthotics and the condition

that he has, so I believe from the catalog some of the New Balance options work

for guys." Id.; Dkt. No. 36 at ¶59. Dr. Smith suggested that physical therapists

at the prison could help the plaintiff stabilize the orthotics in his shoes if he felt

they were moving around. Dkt. No. 38-2 at 45. She further advised him to take

naproxen twice a day as needed, ice twice a day and avoid using sandals or

walking barefoot. Id. She summarized that the plaintiff's issue was "proper

support and until he gets the right shoes and inserts, this pain will not go away

and it will continue to get worse." Id. Dr. Smith requested that the plaintiff be

allowed "to wear personal athletic shoes at all times including off-site visits.

Allow him to order shoes from outside catelog [sic] that are stability shoes and

put his custom orthotics in them." Id. at 43. She encouraged the HSU to send the plaintiff for physical therapy "once he gets his shoes and inserts." Id. at 45.

On July 17, 2018, McArdle advised the plaintiff, as she had several times before, that she was not permitted to override security restrictions setting the $75 price limit on shoe purchases. Dkt. No. 41 at ¶93. McArdle informed the plaintiff that only the warden could waive security rules. Dkt. No. 42-1 at 26. She avers that she was unsure why the plaintiff "believed he needed to exceed the $75.00 limit" because, in her experience, "[t]here were athletic style high top shoes in the pre-approved catalogs within this price range." Dkt. No. 42 at ¶42.

The plaintiff asserts that he was forced to file grievances because of the "denial or prolonging of other specialist recommendations." Dkt. No. 51 at ¶56. In support, he points to a grievance he filed about being denied ice and a TENS unit on one occasion. Id. (citing "Ex. 17"). The plaintiff labeled several pages of his exhibits as "Ex. 17" and did not specify which page or pages were relevant to this assertion. Dkt. No. 46-1 at 82–104. Nonetheless, Waterman avers in her declaration that she became aware of an instance in which the plaintiff had not been given access to a TENS unit ordered in May 2017. Dkt. No. 37 at ¶27. She says she "made sure that the order was promptly implemented and personally showed [the plaintiff] how to use the TENS unit." Id.; Dkt. No. 38-2 at 10, 28.

The plaintiff also contends that "there were several WDOC prisoners with a similarly exact Special Needs Restriction that enabled them to purchase shoes from an outside vendor." Dkt. No. 48 at ¶37. One such inmate is Jackie

Carter, who signed an affidavit the plaintiff filed with his response materials. Dkt. No. 46-1 at 95. Carter says he has two pairs of "tennis/Athletic shoes that was [*sic*] purchased from outside vendors." Id. He says he was authorized to purchase those shoes "via Medical Special Needs Authorization." Id. Carter says the prison issues a special needs authorization "when a patient is not able to wear the states supplies [*sic*] footwear due to a significant medical condition and an alternative off the shelf shoe is necessary." Id.

     5.    *Medical Treatment After Leaving WSPF*

In July 2019, the plaintiff was transferred from WSPF to Green Bay Correctional Institution. Dkt. No. 41 at ¶98. On August 6, 2020, the plaintiff filed an HSR complaining that it was painful to wear his orthotics in his state-issued shoes. Dkt. No. 46-1 at 84. A nurse responded the next day and informed the plaintiff that his "special needs request [was] still pending." Id. The nurse reminded the plaintiff that he had seen a provider on July 20, 2020, at which time the provider had instructed him "to continue plan of care." Id.

On September 28, 2020, the plaintiff filed another HSR asking why he has not "been allowed [his] medical shoe from an outside vendor yet." Id. at 86. He complained that another inmate named George Taylor received a medical restriction "for the same conditions that [the plaintiff] ha[d]; plantar fasciitis [and] being flat footed." Id. The plaintiff advised the HSU to "please be aware of equal protection." Id. A nurse responded the next day by marking the box next to "Refer HSR to:" and the box next to "Special Needs Evaluation." Id. The plaintiff insists that the fact that inmate Taylor received a medical restriction

"shows that Waterman fabricated Plaintiff's air sole shoes being purchased from outside vendor was against DOC policy." Dkt. No. 51-1 at 83, ¶10 (citing Dkt. No. 51-1 at 86). The plaintiff also filed a declaration signed by Taylor, averring that Taylor was provided "medical footwear while housed at the Columbia Correctional Institution" to treat his plantar fasciitis, collapsed medical arches in both feet and bunions. Dkt. No. 46-1 at 90, ¶¶2–3.

On October 19, 2020, the Special Needs Committee at Green Bay approved the plaintiff for a "medical shoe" for one year to address his plantar fasciitis. Dkt. No. 51-1 at 85. The notice of the Green Bay Committee's decision does not describe the approved shoe in any more detail; it does not indicate whether the shoe had a high-top or air bubble cushioning. It simply states that the plaintiff's request for a "medical shoe" had been approved with a one-year time limit.

### 6. *The Plaintiff's Requests for Special Shoes*

On December 1, 2017, the Committee denied the plaintiff's first request for a special shoe restriction. Dkt. No. 36 at ¶18; Dkt. No. 38-2 at 1. The plaintiff's application is not in the record. The memorandum that the prison provided to the plaintiff states, "HSU reviewed your request for a special shoe restriction. HSU is in the process of reviewing all shoe restrictions to bring them in line with DOC policy." Dkt. No. 38-2 at 1. The memorandum quotes the section from Appendix 1 reproduced above and emphasizes the portions advising "HSU will not get involved with ordering extra pairs of personal shoes" and "Tennis shoes shall not be ordered by the HSU." Id. (emphases omitted);

see Dkt. No. 38-5 at 8. The memorandum advises the plaintiff to "follow the property guidelines" and explains, "It is not appropriate to make special requests to the providers/ACP (Nurse Practitioner, doctor)." Dkt. No. 38-2 at 1 (emphasis omitted).

On May 15, 2018, the Committee denied the plaintiff's second request for a special shoe restriction. Dkt. No. 36 at ¶19; Dkt. No. 38-2 at 36. This second memorandum contains identical language to the December 1, 2017 memorandum and again advises the plaintiff, "You must follow the property guidelines." Dkt. No. 38-2 at 36.

Waterman avers that she explained to the plaintiff in writing and in person that WSPF policy prohibited incarcerated persons from ordering personal shoes not included in the approved vendor catalogs unless the inmate had an approved special need or restriction. Dkt. No. 36 at ¶20; Dkt. No. 37 at ¶63. She further explained that the HSU had no authority to order personal shoes for an incarcerated person and that an incarcerated person could qualify for a special need or restriction only if it was medically necessary. Dkt. No. 36 at ¶21; Dkt. No. 37 at ¶63. Waterman avers that, unless there was a medical order or special restriction, she had no authority to acquire shoes for an incarcerated person or grant an exception to WSPF's policy on personal shoes. Dkt. No. 36 at ¶22; Dkt. No. 37 at ¶42.

### 7. *Waterman's Role in the Plaintiff's Medical Treatment*

Waterman avers that she was not responsible for providing medical care to the plaintiff between May 2016 and July 2018. Dkt. No. 36 at ¶52. She

deferred to the medical judgment of the plaintiff's treatment providers and their assessment of the appropriate treatment. Id. at ¶53; Dkt. No. 47 at ¶43. Waterman avers that if medical staff made her aware of an issue or concern that the plaintiff was not receiving treatment for his medical concerns, she would address it consistent with her role as Health Services Manager. Dkt. No. 36 at ¶43; Dkt. No. 37 at ¶27. She says she occasionally reviewed care providers' orders about the plaintiff's medical care and would note in his medical file whether the order was addressed or whether it was permissible under WSPF policy. Dkt. No. 36 at ¶44. It was Waterman's understanding that the care providers determined that the shoes available to the plaintiff through the approved vendor catalogs, combined with other treatment and supports provided, addressed his medical needs. Dkt. No. 36 at ¶54; Dkt. No. 37 at ¶43.

Waterman responded to several of the plaintiff's HSRs filed during the relevant period "so [she] could clarify HSU practice or policy and make sure [the plaintiff] was getting appropriate care." Dkt. No. 36 at ¶40; Dkt. No. 37 at ¶25. She reviewed the plaintiff's medical records in responding to his requests. Dkt. No. 36 at ¶41. Based on her review of the medical records, Waterman believed that the plaintiff "was receiving regular care and that his medical conditions were being treated." Id. at ¶42; Dkt. No. 37 at ¶26.

Waterman avers that she never deleted or removed an order or record from the plaintiff's medical file. Dkt. No. 36 at ¶45. She says she is not aware of any other person deleting or removing orders or records from his HSU file. Id. at ¶46. She avers that she did not direct HSU staff not to make referrals to the

Committee in connection with the plaintiff's care. Id. at ¶48. She denies "verbalizing an intention to prevent [the plaintiff] from receiving 'medical shoes.'" Id. at ¶49. She further contends that she never directed staff or anyone else to deny the plaintiff medical treatment. Id. at ¶50. Nor did she direct an advanced care provider not to provide the plaintiff medically necessary or appropriate treatment. Id. at ¶51. The plaintiff disputes these statements. Dkt. No. 51 at ¶¶45–46, 48–51.

**II.    Discussion**

    A.    Summary Judgment Standard

A party is entitled to summary judgment if she shows that there is no genuine dispute as to any material fact and she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005). The plaintiff's assertions

and disputes alone, without supporting evidence, cannot defeat the defendants'
motions for summary judgment. See Beatty v. Olin Corp., 693 F.3d 750, 754
(7th Cir. 2012) (explaining that "*argument* is insufficient to avoid summary
judgment; the nonmoving party needs to come forward with *evidence*"
(emphasis in original)); see also Cooper v. Haw, 803 F. App'x 942, 946 (7th Cir.
2020) (reaffirming that "argument alone is insufficient to avoid summary
judgment").

B.    Eighth Amendment Standard

As explained in the screening order, the court analyzes the plaintiff's
claims under the Eighth Amendment, which "protects prisoners from
. . . grossly inadequate medical care." Dkt. No. 12 at 4 (citing Gabb v. Wexford
Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v.
Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). But
not "every claim by a prisoner that he has not received adequate medical
treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429
U.S. 97, 105 (1976). To prove that the defendants violated his rights under the
Eighth Amendment, the plaintiff must present evidence establishing that he
suffered from "'an objectively serious medical condition'" and that the
defendants were "'deliberately, that is subjectively, indifferent'" to that
condition. Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir.
2016) (quoting Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008)).
A prison official shows deliberate indifference when she "realizes that a
substantial risk of serious harm to a prisoner exists, but then disregards that

risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. See Burton v. Downey, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Pyles, 771 F.3d at 409 (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[] in a course of treatment known to be ineffective." Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005). To defeat the defendants' motions for summary judgment, the plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." Id. at 654 (quoting Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)).

    C.    Analysis

The court permitted the plaintiff to proceed on claims that McArdle and Waterman were aware of his conditions, refused to provide him the treatment his specialists prescribed and removed information from his medical file to prevent others from giving him appropriate treatment. Dkt. No. 13 at 7. The court noted that the plaintiff's "allegations that he suffered chronic and severe pain over four years satisf[ied] the objective component of an Eighth Amendment claim." Id. at 6–7 (citing Arnett v. Webster, 658 F.3d 742, 753 (7th

Cir. 2011); and <u>Berry v. Peterman</u>, 604 F.3d 435, 441 (7th Cir. 2010)). The defendants do not contest that the plaintiff's foot conditions and resulting pain constitute objectively serious medical conditions. It is undisputed that both defendants were subjectively aware of the plaintiff's conditions. Dkt. No. 37 at ¶¶25, 43; Dkt. No. 42 at ¶4. The question is whether the defendants intentionally disregarded the plaintiff's medical conditions by refusing to provide the treatment his specialists ordered or by removing treatment information from his file so that others could not provide that treatment.

The Western District of Wisconsin has confronted this same issue in at least two cases, both of which bear striking similarities to this case. In <u>Edwards v. Waterman</u>, No. 16-CV-265-JDP, 2019 WL 233512 (W.D. Wis. Jan. 16, 2019), a person incarcerated at WSPF who suffered from plantar fasciitis sued Waterman and other prison staff for failing to properly treat his plantar fasciitis. <u>Id.</u> at *5. The court noted that prison staff provided the plaintiff varied treatment, including "numerous off-site visits to specialists, pain medication, injections, orthotics, night splints, ice, and physical therapy." <u>Id.</u> at *6. The plaintiff had argued that the defendants were deliberately indifferent because they refused "to allow him to order shoes costing more than $75, such as the Nike Air Max or an equivalent shoe, from a non-approved vendor." <u>Id.</u> The Special Needs Committee, which included Waterman, had reviewed the plaintiff's medical care and the recommendations of the offsite specialist, who "did not say that a particular brand of shoe was medically necessary." <u>Id.</u> The Committee concluded that preapproved vendors "offered shoes that would

accommodate [the inmate's] orthotics," so the Nike Air Max shoes were not medically necessary to treat the inmate's plantar fasciitis. Id. The court granted summary judgment for the defendants because it concluded that the Committee's decisions were reasonable, "and no reasonable jury could conclude otherwise." Id. at *7.

In the second case, a different plaintiff at WSPF complained that Waterman and other prison staff violated his Eighth Amendment rights when they provided inadequate treatment for his plantar fasciitis and bone spurs. Burgess v. Boughton, No. 16-CV-846-JDP, 2018 WL 3898351 (W.D. Wis. Aug. 15, 2018). The evidence showed that the defendants provided thorough treatment, including custom orthotics, diabetic shoes to accommodate the orthotics, pain medication, ice, physical therapy exercises and cortisone shots. Id. The court noted that a specialist had recommended high-top shoes if they were allowed under DOC policy, but prison staff offered diabetic shoes instead, refusing to purchase personal high-tops for the plaintiff. Id. The court granted the defendants' motion for summary judgment, explaining that "the Eighth Amendment does not require medical professionals to select, from equivalent alternatives, the treatment option that the prisoner prefers." Id. (citing Berry, 604 F.3d at 441); see also Morales v. Rauch, No. 20-2991, 2021 WL 3877761, at *2 (7th Cir. Aug. 31, 2021) (citing Harper v. Santos, 847 F.3d 923, 927 (7th Cir. 2017)) (explaining that the Eighth Amendment does not entitle an inmate to his preferred medication or treatment "when he was otherwise receiving adequate [medical] care").

The facts of Edwards and Burgess are similar to the facts of this case. The plaintiff's medical records show that HSU staff repeatedly treated his plantar fasciitis and other foot conditions over several years. The HSU provided the plaintiff various treatments including a TheraBand, physical therapy, pain medications, creams and ankle braces, which McArdle avers provided the same support as the high-top, air bubble shoes the plaintiff desired. The HSU ordered him custom orthotics, and McArdle approved him APEX medical shoes, which would have accommodated the orthotics. When one treatment did not work, McArdle and the HSU attempted something else. Contrary to the plaintiff's suggestion, the evidence does not show the defendants persisted "in a course of treatment known to be ineffective." Greeno, 414 F.3d at 655.

The defendants also referred the plaintiff to offsite specialists six times. In certain situations, "'a defendant's decision to ignore instructions from a specialist'" may suggest that she disregarded a risk to the inmate's health or safety. Wilson v. Adams, 901 F.3d 816, 822 (7th Cir. 2018) (quoting Zaya v. Sood, 836 F.3d 800, 806 (7th Cir. 2016)). But "that does not mean that a doctor must always follow the recommendation of a specialist." Id. (citing Petties v. Carter, 836 F.3d 722, 729 (7th Cir. 2016)). The facts show that three podiatrists *recommended* the plaintiff wear athletic, air-soled or bubble shoes; but none of them *prescribed* a specific shoe or brand of shoe. HSU staff, including McArdle and Waterman, repeatedly explained that the podiatrists' recommendations were only recommendations. Dkt. No. 42-1 at 5–6, 8, 27, 34.

The podiatrists also explained that their recommendations were just that and they acknowledged that prison policies could limit their implementation. Dr. Jacobs qualified that his treatment proposals were "simply recommendations" that could be followed only "[i]f that is possible within the DOC system." Id. at 37–38; see also id. at 42 (recommending an athletic type shoe "if possible"). He explained this to the plaintiff, who purportedly expressed understanding that "any access to this type of shoe gear and sandal is the purview of DOC." Id. at 37. Dr. Smith similarly noted, "There are a lot of shoes out there, not just the bubble shoes, that work for orthotics and the condition that he has, so I believe from the catalog some of the New Balance options work for guys." Dkt. No. 38-2 at 45; Dkt. No. 36 at ¶59. It is undisputed that the preapproved vendor catalog that Dr. Smith mentions includes New Balance shoes. Dkt. No. 36 at 25; Dkt. No. 38-4 at 17, 19, 27, 29. The catalog also includes shoes advertised as "high top." Id. at 20, 29, 34–35 (showing men's "high basketball shoes," "basketball high shoes" and "mid-high court" shoes). There is no evidence that the defendants prohibited the plaintiff from ordering those shoes. Because no podiatrist prescribed a specific shoe or type of shoe, whether the defendants followed the specialists' recommendations is irrelevant to determining whether they were deliberately indifferent to the plaintiff's medical condition. See Edwards, 2019 WL 233512, at *7 (quoting Lloyd v. Moats, 721 F. App'x 490, 495 (7th Cir. 2017) ("The fact that [prison doctor] disagreed with the podiatrist's recommendation for special shoes is not

material here because the shoes were not prescribed, only recommended pending 'prison medical department' approval.")).

The evidence shows that HSU staff followed the prison's shoe policy and advised the plaintiff to purchase from the catalog shoes which they believed complied with the policy and would accomplish the goals of the specialists' recommendations. See Dkt. No. 42 at ¶¶18, 42. As the court concluded in Edwards and Burgess, the defendants did not violate the plaintiff's rights when they declined to purchase or provide him the high-top athletic shoes the specialists recommended, because other, adequate alternatives were available to him. See Edwards, 2019 WL 233512, at *6–*7 (concluding that medical defendants adequately treated prisoner's plantar fasciitis even though they did not follow specialist's recommendation "to allow him to order shoes costing more than $75, such as the Nike Air Max or an equivalent shoe, from a non-approved vendor"); Burgess, 2018 WL 3898351, at *6 (concluding that medical defendants did not violate prisoner's Eighth Amendment rights by declining to purchase him high top shoes a specialist had recommended because the evidence showed equivalent alternative shoes were available to him).

The plaintiff also twice asked the Special Needs Committee to authorize non-approved shoes, but the Committee denied both requests and advised him to follow the prison's shoe policies. Dkt. No. 38-1 at 1, 36. It is undisputed that McArdle never was a member of the Committee that reviewed the plaintiff's requests so she cannot be held personally responsible for its decisions. See Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir. 2009). Waterman served on

the Committee but does not recall whether she ever reviewed any of the plaintiff's requests; even if she could be held liable for the Committee's decisions, the plaintiff has provided no evidence suggesting that the Committee's determinations were unreasonable or blatantly inappropriate. The plaintiff's disagreement with the decisions of the Committee, which included at least one medical professional, does not constitute deliberate indifference. See Berry, 604 F.3d at 441 (citing Estelle, 429 U.S. at 106) (noting that "disagreement with a doctor's medical judgment" is insufficient "to prove deliberate indifference in violation of the Eighth Amendment"); see also Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)) (citing Johnson, 433 F.3d at 1013 (same).

The declaration of Jackie Carter does not support the plaintiff's claims. Carter does not identify the condition or conditions from which he suffers that necessitated a special needs restriction allowing him shoes from an outside vendor. Even if he had, the undisputed evidence shows that the defendants repeatedly informed the plaintiff that he could purchase shoes from an outside vendor with the warden's approval. They told him only that the HSU would not provide those shoes or purchase the shoes for him, per the prison's policy. Carter's declaration does not say whether he or his prison purchased his shoes. He says only that he has two pairs of athletic shoes "that was [*sic*] purchased from outside vendor." Dkt. No. 46-1 at 95. Finally, the plaintiff twice requested a Special Needs Authorization, which Carter says he received, but the Committee denied the plaintiff's requests. Although the plaintiff does not

agree, the Committee determined the plaintiff's condition—apparently unlike Carter's—did not warrant a Special Needs Authorization for different shoes. The fact that the Committee granted Carter's request does not demonstrate that McArdle or Waterman knew the plaintiff had an objective need for different shoes and that they disregarded that need. At best, it shows that some incarcerated persons were able to obtain Special Needs Authorizations if necessary, but the issue here is not whether it was possible for an incarcerated person to obtain a Special Needs Authorization, but whether the defendants deliberately refused to provide the plaintiff with needed medical care.

It also does not make a difference that the plaintiff eventually received authorization for a "medical shoe" from the Special Needs Committee at Green Bay Correctional Institution. Dkt. No. 51-1 at 85. This *might* indicate that the members of two Committees disagreed about the plaintiff's medical needs. But like the plaintiff's disagreement with his course of treatment, a difference of opinion "between two medical professionals[] about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Pyles, 771 F.3d at 409 (citing Johnson, 433 F.3d at 1013). That the Green Bay Committee granted the plaintiff a Special Needs Authorization after the WSPF Committee twice denied the plaintiff an authorization does not show that the WSPF Committee (or the defendants) should have granted him the restriction earlier. See Christopher v. Liu, 861 F. App'x 675, 679–80 (7th Cir. 2021) (citing Arnett, 658 F.3d at 754) (rejecting plaintiff's argument that prison doctor "should have personally provided the treatment he ultimately received

from specialists, [because] the Eighth Amendment does not give prisoners the right to demand specific medical treatment, let alone treatment by a specific provider"). As the court has noted, the decision of WSPF's Committee does not reflect McArdle's medical judgment because she was not a member of that Committee. And there is no evidence that the "medical shoe" that the Green Bay Committee authorized was the high-top, air bubble shoe that the plaintiff had been requesting at WSPF.

Nor does inmate George Taylor's medical restriction have any bearing on the plaintiff's claims. The plaintiff asserts that "George Taylor's restriction shows that Waterman fabricated Plaintiff's air sole shoes being purchased from outside vendor was against DOC policy." Dkt. No. 51-1 at 83, ¶10 (citing Dkt. No. 51-1 at 86). But that is not an accurate description of Taylor's situation. Green Bay allowed Taylor to *resume* medical restrictions he had been granted before arriving at that prison. Dkt. No. 51-1 at 86. A doctor allowed Taylor "to buy black white or gray shoes" and allowed his family to "spend more than $75 per pair of shoes." Id. The note does not describe the shoes Taylor could purchase as air sole shoes, bubble shoes or athletic shoes. The doctor did not tell the prison to purchase shoes for Taylor; he authorized Taylor to purchase shoes costing more than $75 from an outside vendor—an option that remained available to the plaintiff, pending warden approval. The doctor also explained that the shoes Taylor purchased "will need to meet all GI Hsu requirements." Id. That a different doctor at a different prison reinstated a different incarcerated person's prior medical restriction for certain shoes—even if that

incarcerated person had medical issues similar to the plaintiff's—does not prove that the defendants denied the plaintiff adequate medical treatment for his condition at WSPF. At best, it may show a difference of opinion between medical providers related to different incarcerated persons with different health histories and medical conditions. That difference of opinion—if, in fact, there even was one—does not suggest that McArdle or Waterman disregarded the plaintiff's medical condition. See Pyles, 771 F.3d at 409.

The plaintiff also filed two affidavits from incarcerated persons who say they overheard Waterman "verbalize[] her intention to prevent [the plaintiff] receiving some special shoes." Dkt. No. 49 at 3. Inmate Tduardo J. Head, Sr., avers that on March 31, 2017, Waterman told a correctional officer that the plaintiff "had just returned from [an] offsite visit with a specialist & that the specialist had order[ed] for [the plaintiff] to have access to receive his own personal medical item specialist ordered." Dkt. No. 51-1 at 87, ¶¶2–3. According to Head, Waterman said the plaintiff "had another than [*sic*] coming; as if to say that [the plaintiff] would not receive/have access to what the specialist order[ed] for him." Id. Head later ran into the plaintiff and told him what he had heard Waterman say to the officer. Id. at ¶4. Inmate Greg Atwater avers that he overheard Waterman tell a nurse not to "make any order or notes about shoes" because she was "in hot water about it." Id. at 61, ¶2. Atwater says he knew the plaintiff "had health issues with foot pain and was in special need of specific shoes to accommodate foot pain." Id. at 62, ¶4. Atwater "requested to provide [the plaintiff] with an affidavit about the matter." Id.

As noted, the undisputed evidence shows the plaintiff was provided adequate medical treatment even without the athletic or high-top shoes. Whether Waterman told other HSU staff that she would not provide the plaintiff the shoes is irrelevant. Second, there is no dispute that Waterman did not provide the plaintiff the shoes. Both defendants repeatedly told the plaintiff that prison policy prohibited the HSU from providing him the athletic shoes he wanted. That was a decision for the Special Needs Committee, which twice denied the plaintiff's request for athletic shoes. Neither of these declarations suggests that Waterman prevented the plaintiff from having medically necessary treatment or items. Head's declaration shows, at most, that Waterman was frustrated with the plaintiff's repeated demands for the special shoes. Her alleged verbalized frustration, which was not directed at the plaintiff, did not violate his rights. See Lisle v. Welborn, 933 F.3d 705, 719 (7th Cir. 2019) (explaining that prison staff's use of even "[r]epugnant words . . . will seldom rise to an Eighth Amendment violation" because "[r]elationships between prisoners and prison staff are not always marked by genteel language and good manners"). Atwater's declaration shows, at most, Waterman's advice to a nurse to follow Bureau of Health Services Policy and Procedure #300.07, which requires nurses and providers to direct special requests to the Special Needs Committee for review, rather than write an order for the item. See Dkt. No. 37 at ¶46; Dkt. No. 38-5 at 2 ("Prescribing practitioners shall refer items to the committee/nurse for review of special needs rather than write orders for

specific items."). These declarations are not evidence that Waterman disregarded the plaintiff's medical needs or provided inadequate medical care.

One can infer that the plaintiff disagrees with the prison's policy regarding medical shoes for inmates. But the plaintiff has not challenged that policy. If he had, neither Waterman nor McArdle would be proper defendants for that claim; there is no evidence that they created or implemented policies in the prison. They were part of the medical staff and may be held responsible only for their decisions related to medical treatment. See Burks, 555 F.3d at 595–96.

The Eighth Amendment does not entitle an incarcerated person to demand specific care or the best care possible; it entitles him to adequate, reasonable medical care "to meet a substantial risk of serious harm." Forbes v Edgar, 112 F.3d 262, 267 (7th Cir. 1997). The undisputed evidence shows that the defendants made concerted efforts to address the plaintiff's medical issues with different types of treatments and with multiple offsite consultations. When the plaintiff remained dissatisfied with his treatment, McArdle sent him to a different specialist for a second opinion. The defendants repeatedly told the plaintiff that prison policies prohibited the HSU from providing him the shoes he wanted and that the specialists had recommended. The specialists acknowledged that their recommendations were subject to prison rules. McArdle nonetheless attempted to implement the recommendations while complying with prison policy. She explained to the plaintiff that he could purchase his own athletic, high-top shoes from an approved vendor or an

outside vendor with the warden's approval. The plaintiff persisted in his desire for high-top, athletic shoes but appears to have made no effort to obtain the warden's approval for them. He twice sought a special accommodation for the shoes, but the Committee denied both requests. The plaintiff's dissatisfaction with the treatment McArdle and Waterman provided does not amount to deliberate indifference under the Eighth Amendment. The defendants are entitled to judgment as a matter of law.[5]

### D. Falsification of Medical Records

The plaintiff also alleged in his amended complaint, and maintains throughout his opposition materials, that the defendants falsified or altered his medical records. He says the defendants crossed out portions of specialists' recommendations or otherwise altered his medical files. Dkt. No. 12 at 3–4; Dkt. No. 48 at ¶34. The plaintiff does not explain what records he believes are fabricated or what his records should show. The court located one page of prescriber's orders in which a recommendation is crossed out. Dkt. No. 46-1 at 73. This order includes Dr. Smith's recommendations after the plaintiff's July 2018 visit at the University of Wisconsin clinic. See Dkt. No. 38-2 at 43–45. The crossed-out recommendations are that the plaintiff be allowed "to wear personal athletic shoes at all times including offsite visits" and that the HSU

---

[5] Because the court is granting summary judgment to the defendants on the merits, it need not evaluate their alternative claim that they are entitled to qualified immunity. See Sierra-Lopez v. County, No. 17-CV-1222-PP, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, No. 17-CV-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

allow him "to order shoes from outside catalog" in excess of $75. Dkt. No. 46-1 at 73. Next to these recommendations is a handwritten note that says, "Not allowed DOC policy." Id. There are several notations on the right side of this page, with the initials "SM" next to them; McArdle's initials are "SM." Id. It appears from the notes that McArdle accepted the remaining recommendations (no barefoot walking, icing, Naproxen) or asks the HSU to schedule the plaintiff for treatment in line with the recommendations (inserts). Id. McArdle confirmed her comments in the plaintiff's progress notes, where she noted that she explained to the plaintiff the "DOC rule about purchasing anything from an outside vendor. . . . The warden is the only person who can waive a security rule." Dkt. No. 42-1 at 26; Dkt. No. 42 at ¶71. McArdle avers "that the shoes available to Plaintiff conform to what the podiatrists are recommending." Dkt. No. 42 at ¶70. She later provided him medical shoes to accommodate his orthotics, though those were not the athletic-style shoes the plaintiff wanted. Id. at ¶72.

Someone—perhaps even McArdle—crossed out Dr. Smith's recommendations regarding wearing personal athletic shoes and allowing the plaintiff to order shoes from an outside catalog for more than $75. But that does not prove that whoever crossed out that language falsified medical records. Dr. Smith's recommendations remain visible and they are available in other places in the medical records. The note indicates that whoever crossed out the recommendations did so because prison policy did not allow accommodation of the crossed-out recommendations.

In several places, Waterman (or another HSU staff member) initialed or signed off on prescriber orders or requests. See Dkt. No. 46-1 at 73–74, 100–04. Waterman explains that these notes were for "record-keeping purposes." Dkt. No. 37 at ¶29. She avers that she initialed a note next to a provider's order to signify that she "had addressed it. These notions do not 'delete' or disregard a medical order; to the contrary, they are meant to show that the information has been reviewed." Id. She confirms that some of the notations were made by other HSU staff members and not by her. Id. at ¶30. The defendants' notes or initials on the plaintiff's medical records do not constitute a falsification of his medical records.

### III. Motion for Recruitment of Counsel (Dkt. No. 33)

For the second time, the plaintiff has requested that the court recruit a lawyer to represent him. Dkt. No. 33. He reiterates that he cannot afford counsel. Id. at ¶1. He notes the court's previous conclusion that the plaintiff had satisfied the requirement that he attempt to retain counsel on his own. Id. at ¶2. He attached letters from Lonnie Story of Story Law Firm showing the plaintiff's efforts to have Mr. Story represent him. Dkt. No. 33-1. In the first letter, dated August 25, 2021, Attorney Story indicated that he was enclosing a retainer agreement for the plaintiff to execute, asked for records and stated that he looked forward to "continuing to prosecute [the plaintiff's] claim toward a successful conclusion." Id. at 1. In the second letter, dated September 21, 2021, Attorney Story stated that he had received the plaintiff's letter asking Attorney Story to represent the plaintiff in the plaintiff's "prior criminal case to

access [the plaintiff's] release account funds;" Attorney Story states that "[b]ecause my firm represents you in your civil suit only, and not in the criminal matter," he respectfully declined to represent the plaintiff in the criminal case. Id. at 2. Story stated, "In order for my firm to pursue the account funds, we would be required to enter a notice of retainer/appearance on your behalf, for which we have no agreement." Id. Story indicated that he would "continue to zealously represent [the plaintiff] in [his] civil suit." Id. The third letter, dated October 21, 2021, declined to represent the plaintiff. Id. at 3. Mr. Story stated that the second letter "was sent in error" and that the firm had not agreed to represent the plaintiff until it received and reviewed his records. Id. Mr. Story cited "the large, voluminous amount of records and documents" that the plaintiff had sent to the firm and concluded that he was "unable to take on" the case. Id.

The plaintiff says he received Mr. Story's third letter on October 25, 2021 and believed Mr. Story had been representing him since receiving the second letter. Dkt. No. 33 at ¶3. The plaintiff says he missed the October 22, 2021 discovery deadline because Mr. Story did not timely return his documents and misled him into believing he was representing the plaintiff. Id. at ¶3.B. He asserts that because he sent so much paperwork to Story, he was "w/out his vital supporting evidence that [he] needs to prove his claim." Id. at ¶3.C. The plaintiff says that even if he did have the paperwork, "it would be extremely hard" for him to view it "and use it in the most effective way in relation to proving his claim as a lawyer." Id. at ¶3.D. The plaintiff says the legal and

factual issues of his case are too complex for him to litigate or handle "in preparation of trial." Id. at ¶3.E.

The court previously explained the standard that the court must use in evaluating a request for appointment of counsel from an indigent plaintiff. Dkt. No. 10 at 8–9 (citing Pennewell v. Parish, et al., 923 F.3d 486, 490 (7th Cir. 2019); and Pruitt v. Mote, 503 F.3d 647, 653 (7th Cir. 2007)). The court must determine 1) whether the plaintiff has "made a reasonable attempt to obtain counsel" and, if so, 2) whether he appears "competent to litigate it himself." Id. at 9 (quoting Pennewell, 923 F.3d at 490).

The court already has concluded that the plaintiff satisfied the requirement that he attempt to recruit counsel on his own. Id. at 10. The letters he attached to his second motion for appointment of counsel show that he continued his efforts to retain an attorney on his own but that he has been unsuccessful. The court continues to believe that the plaintiff has satisfied the first Pruitt requirement.

But the plaintiff still has not satisfied the second requirement. The plaintiff has had no difficulty communicating with the court in writing. Id. at 11–12. He followed the court's instructions to file an amended complaint and to limit it to only one of the several, unrelated claims he originally tried to raise. His amended complaint was clear and straightforward. It did not suffer from the wordiness issues the court noted in the first screening order and it adequately explained the facts that the plaintiff believed give rise to a cause of action. The plaintiff's later materials, including his responses to the defendants'

motions for summary judgment, further show he has been able to litigate this case adequately on his own. The plaintiff is a better communicator than many unrepresented plaintiffs whose pleadings the court reviews. His handwriting is clear and legible. He is a good writer—he conveys his arguments and ideas clearly and logically. He directly addresses and responds to the defendants' arguments. He cites to source documents for many of his arguments (although, as the court has noted, there are occasions where he cites to documents the court could not find, or uses the same exhibit number for multiple documents). He has filed hundreds and hundreds of pages of documents with the court—he even filed two briefs in opposition to each motion for summary judgment. The plaintiff has done a very thorough, capable job of representing himself.

The court sympathizes with the plaintiff's misunderstanding with Mr. Story and his firm. But at this point, that misunderstanding is not a basis for the court to recruit counsel. The plaintiff is responsible for litigating his lawsuit. He was responsible for seeking discovery unless and until an attorney agreed to represent him and filed a notice of appearance. The plaintiff says he received Mr. Story's third letter on October 25, 2021, but he did not notify the court about the letters and the misunderstanding until he filed his motion for appointment of counsel on November 16, 2021—more than three weeks later and nearly a month after the discovery deadline had elapsed. If the plaintiff believed he needed additional time to conduct discovery, he could have requested an extension of the discovery deadline. He did not. Nor did the

plaintiff ask the court to reopen discovery while he waited for Mr. Story to return his paperwork.

The plaintiff also never requested an extension of time to respond to the defendants' motions for summary judgment. Nor did he wait to file his response materials until the court had ruled on this motion. He timely responded to the defendants' materials on his own. Although the court may grant leniency to *pro se* plaintiffs litigating cases on their own, it is the plaintiff's responsibility to inform the court about the status of his case and request additional time when needed. The fact that he is representing himself does not relieve the plaintiff of this obligation. See Lipinski v. Castaneda, 830 F. App'x 770, 772 (7th Cir. 2020); Smith v. Adams, 804 F. App'x 390, 391 (7th Cir. 2020).

The court has should have addressed the plaintiff's motion sooner than it did. But the court has reviewed extensive materials provided by the plaintiff and the defendants, as well as the parties' legal arguments. It has concluded that the defendants are entitled to judgment as a matter of law. Whether a lawyer had presented the evidence or the plaintiff presented it himself, the evidence does not support the plaintiff's claims. The court will deny the plaintiff's motion for recruitment of counsel.

## IV. Motion to Amend Brief (Dkt. No. 58)

About three weeks after the court received his response materials, and after defendant McArdle filed her reply, the court received from the plaintiff a motion to amend his brief(s) in opposition to the defendants' motions for

48

summary judgment. Dkt. No. 58. (The motion did not specify whether the plaintiff wanted to amend the brief responding to McArdle's motion, the brief responding to Waterman's motion or both.) The plaintiff "remind[s] this Court" that he is incarcerated and representing himself. Id. at 1–2. He says he had to prepare his response materials "without the assistance of the law library as accessibility to the institution law library was greatly limited due to staff shortages and COVID-19 protocols." Id. at 3. He says that while he knew when he filed the lawsuit that he would not have access to paralegals, clerical assistants or other resources enjoyed by other litigants, he "could not envision having limited access to the institution law library or to other offenders for assistance" when he filed his complaint. Id. The plaintiff says he "expressed [*sic*] mailed the documents to the Court," at great cost. Id. He asserts that because of his haste and his lack of access to the law library, "facts and arguments were not fully developed." Id. He asks the court "to be innovative in response to [his] status as an incarcerated, pro se litigant." Id. The plaintiff asserts that "the defendant's [*sic*] would not be prejudiced by the granting of this request as [he] will not present new facts or argument, rather will [*sic*] take this opportunity to strengthen the current arguments with existing facts." Id. at 3–4. He points out that the court granted Waterman an extension of time to file her reply brief, and reasons that it would be "prudent" to let him amend his "motion in opposition." Id. at 4.

McArdle opposes the plaintiff's motion. Dkt. No. 62. She asserts that allowing the plaintiff to amend his brief now, after both defendants have replied

to his opposition materials, would prejudice the defendants by allowing the plaintiff to "make arguments not included in his original Response to which [the defendants] Replied." Id. at 1–2 (citing Grisham v. Integrity First Bank, No. 13-cv-587-bbc, 2014 U.S. Dist. LEXIS 23847, at *7 (W.D. Wis. Feb. 25, 2014); and Knapp v. Evgeros, Inc., 322 F.R.D. 312, 316 (N.D. Ill. 2017)). She argues that granting the plaintiff's motion would allow him "to simply file an affidavit or other documents, not originally included in his opposition materials," to create a factual dispute. Id. at 2. She asserts the plaintiff has not provided good cause for the relief he seeks. Id. at 2–3.

Allowing the plaintiff to amend his response materials after briefing was concluded would prejudice the defendants. The plaintiff says he does not seek to amend his complaint to add new facts or argument but seeks only "to strengthen the current arguments with existing facts." Dkt. No. 58 at 3–4. But if the court were to grant the plaintiff's motion, his amended response would be a surreply—a reply to the defendants' reply briefs. Neither the Federal Rules of Civil Procedure nor this court's Civil Local Rules permit the plaintiff to file a reply to a reply. There is a reason for that—the moving party (here, the defendants) is the party with the burden of persuasion, so that party (again here, the defendants) gets the last word. The court has the discretion to allow such a sur-reply but "'only for valid reasons, such as when the movant raises new arguments in a reply brief.'" Watt v. Brown Cty., 210 F. Supp. 3d 1078, 1082 (E.D. Wis. 2016) (quoting Meraz-Camacho v. United States, 417 F. App'x 558, 559 (7th Cir. 2011)). The plaintiff has not alleged that the defendants

made new arguments in their reply briefs; at the time he filed this motion, Waterman had not yet even filed her reply brief.

The plaintiff says he wants to amend his brief because he feels he needed more time to work on it, given the lack of access to the library and the fact that he has been representing himself. As the court has explained, however, the plaintiff could have asked for an extension of time to file his opposition materials. It is commendable that the plaintiff worked hard to abide by the deadlines the court had set. But it was only after McArdle had replied that he informed the court that he needed additional time and that access to the prison's law library was limited. If he had provided this information to the court before his opposition materials were due—as many other plaintiffs have done over the course of the pandemic—the court could have given him additional time.

The plaintiff's assertion that he could not have foreseen limitations on his access to other incarcerated persons or the law library at the time he filed his complaint does not add up. The plaintiff filed his initial complaint on August 14, 2020. By then, the COVID-19 pandemic had forced the closure of businesses and resulted in severe restrictions in prisons and many public institutions, including the court. Many state prisons limited inmate gatherings and access to open spaces (like the law library) to slow the spread of the virus. Many incarcerated persons requested extensions of time in civil and criminal cases, which the court granted. The plaintiff was incarcerated all through 2020 and 2021. See DOC Offender Search, https://appsdoc.wi.gov/lop/detail.do

(DOC # 00263944). He had reason to know, as did many other incarcerated persons, that his ability to interact with other incarcerated persons and to access the law library was likely to be limited.

Perhaps more to the point, the plaintiff's lengthy response materials show he was able to respond to the defendants' motion adequately. He filed two opposition briefs to McArdle's motion—a total of 178 pages—as well as a declaration and attachments totaling thirty-seven pages and sixteen pages of findings of fact. He filed two briefs in response to Waterman's motion; his response to her proposed findings of fact and attachments totaled 111 pages. It is hard to imagine what more the plaintiff could do to "strengthen" his arguments, other than what it seems likely he'd like to do—have the last word in responding to the defendants' replies. The plaintiff and the defendants have provided the court with many, many facts, which the court has viewed in the light most favorable to the plaintiff. Allowing the plaintiff to amend his brief(s) would not change those facts. The court will deny the plaintiff's request to amend his response brief(s).

## V.    Conclusion

The court **DENIES** the plaintiff's motion to appoint counsel. Dkt. No. 33.

The court **DENIES** the plaintiff's motion to amend his brief in opposition to the defendants' motions for summary judgment. Dkt. No. 58.

The court **GRANTS** defendant Jolinda Waterman's motion for summary judgment. Dkt. No. 34.

The court **GRANTS** defendant Sandra McArdle's motion for summary judgment. Dkt. No. 39.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 16th day of August, 2022.

BY THE COURT:

**HON. PAMELA PEPPER**
**United States District Judge**